# IN THE UNITED STATES DISTRICT COURT FOR THE
# DISTRICT OF CONNECTICUT

| | |
|---|---|
| MINI STUDIO, INC. | 3:26-cv-00103 |
| v. | Monster Library Answer |
| KEVIN WANSA AND THE MONSTER LIBRARY | 2026-02-11 |

## Nature of the Action

1. Denied.

2. Denied.

3. Denied.

4. Legal conclusions or assertions of rights need not be admitted or denied.

## Parties

5. Denied.

6. Admitted.

7. Denied.

8. Denied.

## Jurisdiction and Venue

9. Denied.

10. Admitted.

11. Denied.

## Mini Studio's Work

12. Denied that Mini Studio may own a valid copyright in a work generated by prompting generative AI. Denied that there is any protectable expression in a work generated by prompting generative AI. Denied that PURP's silhouette, proportions, facial feature configuration, fur and texture presentation, color treatment, or design or placement of a winter hat are "distinctive".

13. Admitted.

14. Denied. Generative AI software generated PURP in response to prompting. There is no author or creator of PURP.

15. Denied. There are no rights to own.

## Defendants' Conduct

16. Admitted that Defendants make and display videos. Denied that Defendants made or displayed an "Infringing" video. Denied that any of Defendants' work contains any subject matter "substantially similar to, and unlawfully derived from" PURP.

17. Denied.

18. Denied as to the characterization of an "Infringing" video. Otherwise admitted.

19. Denied. Mr. Wansa worked for Mini Studio from November 2022 through February 2024. By and through counsel, Mini Studio has admitted that PURP was not developed until September 2024, long after Mr. Wansa's access to Mini Studio files ended.

20. Denied.

## Pre-Suit Notice and Conduct

21. Admitted. In February 2024, Mr. Wansa was terminated from Mini Studio and lost all access to Mini Studio files.

22. Denied that any Monster LIbrary character is "substantially similar to Mini Studio's PURP character". Denied that Defendants knowingly or willfully infringed any valid copyright.

## YouTube DMCA Takedown and Counter-Notification

23. Admitted.

24. Admitted.

25. Legal conclusions or assertions of rights need not be admitted or denied.

## Absence of Harm or Need for Injunction

26. Denied.

27. Denied that Mini Studio has any right or harm to be remedied by law or equity.

28. Denied.

## Count One — Copyright Infringement

29. Denied and admitted as above.

30. Denied.

31. Denied.

32. Denied.

33. Denied.

34. Denied.

    Respectfully,
    *s/Alan Harrison*
    Alan Harrison (ct29464)
    alan@sandollar-law.net
    203.212.9996
    Sandollar PLLC
    185 Broad Street
    Milford, CT 06460

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF CONNECTICUT

MINI STUDIO, INC.                           3:26-cv-00103

v.                                          Monster Library Counterclaim

KEVIN WANSA AND THE
MONSTER LIBRARY

---

Kevin Wansa and The Monster
Library, L.L.C.                             2026-02-11

v.

Youmna Chamcham and Mini
Studio, Inc.

## Count One: Defamation Per Se

1. Monster Library is a Connecticut LLC that does business throughout the country, including in San Francisco / Silicon Valley.

2. Monster Library's business includes creating animated characters, the "monsters" for which the company is named.

3. Monster Library uses AI to help in creating animated characters.

4. Monster Library was founded by Kevin van Witt in 2024.

5. Before founding Monster Library, Mr. van Witt worked for Mini Studio.

6. Mini Studio also is in the business of creating animated characters with AI assistance.

7. Mini Studio competes with Monster Library.
8. At Mini Studio, Mr. van Witt worked directly with Youmna Chamcham, the owner of Mini Studio.
9. When Mr. van Witt left Mini Studio, Ms. Chamcham was angered by his departure.
10. Soon after Mr. van Witt founded Monster Library, Ms. Chamcham by and through Mini Studio began a campaign to disparage and defame Monster Library in the Silicon Valley investor community.
11. Specifically, Ms. Chamcham and Mini Studio have accused Monster Library of stealing Mini Studios characters (copyright infringement).
12. The field of AI-created animated characters is regarded in Silicon Valley as a burgeoning investment opportunity.
13. Intellectual property rights are very important in the field of animated characters, generally.
14. Within the past year, Monster Library has been in the running for several lucrative opportunities in its field.
15. One such opportunity was a $12,000 contract with Luma AI.
16. Another such opportunity was the Chroma Award, a $3000 cash prize for innovative animated character development.
17. Another such opportunity was a $100,000 deal with Chronicle Studios.
18. Another such opportunity was a $1M investment package from DMC Ventures.
19. Monster Library was working under contract with Luma Ai in October 2024.

Alan Harrison — SANDOLLAR Law — Milford, Connecticut

20. Luma AI is now work over $3 billion dollars and has raised $900 million to date.

21. Monster Library helped Luma AI get their first 1M users with the "Monster Camp Trailer" that got 100M views.

22. Directly following a podcast interview by Monster Library and Luma AI on X, Youmna ChamCham the CEO of Mini Studio sent a LinkedIn message to Caroline Ingeborne the COO of Luma telling her to not work with Monster Library.

23. Ms. Chamcham on behalf of Mini Studio told Luma AI that Monster Library's founder Kevin Wansa had "started that shadow account copying all our content… making the same posts and videos for us and for his own".

24. Monster Library's business relationship with Luma AI, that had generated approximately $12,000 in partnership revenue and had great potential for growth, went cold after the communication from Mini Studio.

25. At that time, Ms. Chamcham knew that her statements to Luma AI were false.

26. Ms. Chamcham made her statements to Luma AI with reckless disregard for their falsity.

27. Due entirely to Defendants' efforts to defame it, Monster Library was not able to maintain a business relationship with Luma AI.

28. When Monster Library was granted the Chroma Award, Ms. Chamcham on behalf of Mini Studio contacted the award committee to inform them of a spurious DMCA takedown that she had filed against Monster Library's award-winning Youtube video. She also stated to the award committee that

Monster Library's Remi character was an infringing derivative of Mini Studio's copyrighted PURP charater.

29. At that time, Ms. Chamcham knew that Mini Studio had no valid copyright in PURP. Ms. Chamcham also should have known, with reasonable investigation, that Monster Library developed Remi independently without access to PURP.

30. Ms. Chamcham made her statements to the Chroma award committee with reckless disregard for their falsity.

31. The Chroma Award sponsors informed Monster Library that the company would be disqualified from the award based on Ms. Chamcham's statements.

32. While Monster Library was negotiating the Chronicle Studios deal, Ms. Chamcham on behalf of Mini Studio contacted Chronicle Studios and badmouthed Monster Library to the extent that Aaron Sisto of Chronicle Studios was "very turned off". Ms. Chamcham stated to Mr. Sisto that Monster Library's Remi character was an infringing derivative of Mini Studio's copyrighted PURP charater.

33. At that time, Ms. Chamcham knew that Mini Studio had no valid copyright in PURP. Ms. Chamcham also should have known, with reasonable investigation, that Monster Library developed Remi independently without access to PURP.

34. Ms. Chamcham made her statements to Mr. Sisto with reckless disregard for their falsity.

35. On October 12, 2024, Monster Library was invited to interview for the A16Z Speedrun funding program on October 15, 2024.

Alan Harrison — SANDOLLAR Law — Milford, Connecticut

36. The prospective result of success in the Speedrun program was a $1M investment from the A16Z investor network.

37. Mini Studio also was invited to interview on the same date.

38. The interview panel for Monster Library included Rubin Guo, Marcus Segal, and Joshua Lu.

39. Mini Studio's interview panel also included Joshua Lu.

40. Ms. Chamcham on behalf of Mini Studio disparaged Monster Library, directly or indirectly, to investors that Monster Library met with through the A16Z Speedrun program. For example, DCM Ventures heard from Ms. Chamcham, directly or indirectly, that Monster Library's Remi character was an infringing derivative of Mini Studio's copyrighted PURP charater.

41. At that time, Ms. Chamcham knew that Mini Studio had no valid copyright in PURP. Ms. Chamcham also should have known, with reasonable investigation, that Monster Library developed Remi independently without access to PURP.

42. Ms. Chamcham made the statements that reached DCM Ventures with reckless disregard for their falsity.

43. As a result of Ms. Chamcham's statements, the investor meeting between DCM Ventures and Monster LIbrary was derailed by a series of questions about Mini Studio and Ms. Chamcham's allegations.

44. On December 22, 2024, Mini Studio announced acceptance of $1M funding from the A16Z investor network.

45. Due primarily to Defendants' efforts to defame it, Monster Library did not close the $100,000 Chronicle Studios deal.

46. Due entirely to Defendants' efforts to defame it, Monster Library has not received the $3000 Chroma Award money.

47. Due primarily to Defendants' efforts to defame it, Monster Library did not receive a $1 million investment through the A16Z Speedrun program.

48. Ms. Chamcham and Mini Studio intend to continue disparaging and defaming Monster Library, including with false and baseless accusations of copyright infringement.

49. Ms. Chamcham and Mini Studio are aware that Monster Library is a Connecticut company. At all times that they acted against Monster Library, they were aware that their actions would do harm to Monster LIbrary in the State of Connecticut.

50. Ms. Chamcham and Mini Studio derive substantial revenue from interstate commerce.

51. In continuance of their campaign of defamation, Ms. Chamcham through Mini Studio brought this lawsuit in the Federal District Court for the District of Connecticut.

## Count Two: Tortious Interference with Business Expectancies

52. Monster Library repeats paragraphs 1-29 of Count One.

53. Defendants intend for their campaign of defamation to interfere with Monster Library's future business opportunities.

54. Defendants' campaign of defamation already has deprived Monster Library of four significant business opportunities.

Alan Harrison — SANDOLLAR Law — Milford, Connecticut

## Count Three: CUTPA Violation

55. Monster Library repeats paragraphs 1-32 of Counts One and Two.
56. Defendants' campaign of defamation is an unscrupulous mode of competition in the marketplace for animated characters.
57. Defendants' campaign of defamation has caused Monster Library substantial economic injury.
58. Defendants have used this baseless copyright lawsuit as an implement for their campaign of unfair competition.
59. This lawsuit constitutes copyright fraud, which is an unfair mode of competition.
60. Under Connecticut law, attorney fees may be awarded for a violation of CUTPA (Conn.Gen.Stat. § 42-110a et seq.).
61. Mr. Wansa developed the Mini Studio workflow for generating animated characters using generative artificial intelligence (gen AI).
62. The Mini Studio workflow starts when a human artist provides a concept character to gen AI as a prompt. The human artist then provides modification prompts to gen AI, such as, "make it more purple", "make it shaggier", "make the eyes nicer". This is similar to direction that the human artist might receive from an employer.
63. In response to the human artist's prompting, gen AI modifies the concept character. The prompting continues iteratively until the human artist is satisfied with the output.
64. In an analogous situation of the human artist being prompted by their employer, the artist and not the employer would be considered the author

or creator of the output.

65. The Copyright Office requires human creation or authorship of a work for registration of copyright in the work. The Copyright Office has held that monkeys and machines cannot generate copyright work.

66. One of the decisions from the Copyright Office, holding that an AI-generated work is not eligible for copyright registration, was issued to a Mini Studio employee during her employment by Mini Studio.

67. At all relevant times, Mini Studio knew that machine-generated works are not eligible for copyright registration.

68. Mini Studio has repeatedly explained that its machine-generated works are not copyright material. For example, "The Fuzzlets, entirely created with our AI-powered technology."

69. Mini Studio has repeatedly explained that its machine-generated works are not copyright material. For example, "Viral AI-native IP, The Fuzzlets."

70. Mini Studio has repeatedly explained that its machine-generated works are not copyright material. For example, "Any idea that you have in your head and prompts that you describe can be **put into form by the AI**."

71. Mini Studio has repeatedly explained that its machine-generated works are not copyright material. For example, "through AI so we're able to automatically generate comic books[.]"

72. On January 2, 2026, Mini Studio filed a DMCA takedown against Monster Library's Chroma Award-winning Youtube video, based on alleged infringement of Mini Studio's machine-generated PURP character.

73. On January 9, 2026, Monster Library filed a counternotice.

74. On January 13, 2026, Mini Studio filed an application for copyright registration of "PURP ? Character Model Sheet".

75. On January 21, 2026, Mini Studio filed this lawsuit.

76. In filing an application for copyright registration of PURP, after filing a DMCA takedown notice against Monster Library, Mini Studio submitted only a concept character sketch and did not disclose that gen AI was the generator of the allegedly-copied PURP character.

77. Mini Studio generated the concept character sketch for its copyright application, also using generative AI, only after filing the DMCA takedown notice.

78. In asserting that its copyright registration for the concept character sketch also covered the allegedly-copied PURP character, Mini Studio asserted to the Court that copyright registration was available for a work produced by generative artificial intelligence.

79. In asserting that Monster Library or Mr. Wansa copied its copyright-registered work in making Remi, Mini Studio did not submit to the Court a copy of the deposit on which its copyright registration was granted.

80. In asserting that Monster Library or Mr. Wansa copied its copyright-registered work in making Remi, Mini Studio asserted to the Court that when Remi was created, Monster Library or Mr. Wansa had access to the deposit filed with the copyright application.

81. Mini Studio knew when this lawsuit was filed that Mr. Wansa could not have had access to Mini Studio's copyright deposit when he created Remi, because the copyright deposit was not generated by Mini Studio until

sixteen months after Mr. Wansa created Remi and several days after Mini Studio filed a DMCA takedown against Remi.

82. The Court may award attorney fees to the prevailing party in a copyright infringement case.

## Count Four: Wage Theft

83. Mr. Wansa worked for Mini Studio from November 2022 to February 2024, as a Creative Director.

84. At the time, Mini Studio was a software and tech company building an AI-based studio platform that allowed users to create their own content.

85. Mr. Wansa worked for Mini Studio in Connecticut.

86. From July 1, 2022 to June 1, 2023, Connecticut minimum wage was not less than fourteen dollars per hour.

87. From June 1, 2023 to January 1, 2024, Connecticut minimum wage was not less than fifteen dollars per hour.

88. Effective January 1, 2024, Connecticut minimum wage was not less than fifteen dollars and sixty-nine cents per hour.

89. During his employment by Mini Studio, Mr. Wansa worked extremely long hours, often well over 40 hours per week, including weekends.

90. For roughly the first eight months of his time at Mini Studio, Mr. Wansa worked more than full-time but was not classified as a full-time employee. He did not receive benefits.

91. Mr. Wansa initially was paid $4,000 per month.

92. After a few months Mini Studio raised Mr. Wansa's monthly salary to $5,000 and added benefits about 6 months into employment.

93. Beginning in the summer of 2023, Mini Studio demanded that Mr. Wansa work nights, days, weekends, and effectively be on call at all times. His workload routinely exceeded eight hours per day and often extended to 12–16 hour days. Mr. Wansa was working around the clock.

94. In the summer of 2023, Connecticut required overtime pay for work in excess of 40 hours per week.

95. From the summer of 2023 through the fall of 2023, Mr. Wansa was working at least 80 hours per week and sometimes over 100 hours per week.

96. In the summer of 2023, statutory pay for Mr. Wansa's working hours would have been about $1500 per week up to about $1950 per week.

97. But Mr. Wansa was paid only $1000-$1250 per week.

98. There was a shortfall of $950-$250 per week in Mr. Wansa's pay for a period of about 30 weeks.

99. Double damages and attorney fees are available under Connecticut statutes for failure to pay fair wages.

## Count Five: Failure to Issue Vested Equity

100. January 13, 2023, Mini Studio offered Mr. Van Witt a grant of 90,000 shares, subject to Board approval, under a standard 4-year vesting schedule with a 1-year cliff (12/48ths at one year, then monthly thereafter).

101. Mr. Van Witt's employment by Mini Studio continued through February 15–16, 2024.

102. The one-year anniversary of the grant occurred in January 2024.

103. Under the written vesting terms, 22,500 shares of Mini Studio would have vested to Mr. Van Witt on January 13, 2024.

104. Mr. Van Witt never received:

- A formal option grant notice;
- A board approval document;
- Notice of a cap table entry;
- A cancellation or forfeiture notice at termination.

105. On February 7, 2024, Mini Studio requested to restructure Mr. Van Witt's equity to 5% of the option pool, thereby acknowledging vesting of Mr. Van Witt's 22,500 shares. The request referenced limited runway.

106. Mr. Van Witt never received or approved a formal amendment, board approval, or executed modification of his 22,500 share stake in Mini Studio.

107. On February 15, 2024, Kevin was locked out of Slack and all company systems without explanation. On February 16, he received a cease-and-desist letter, effectively terminating employment and halting vesting and payments. No equity reconciliation or vesting accounting was provided.

WHEREFORE, Kevin Wansa and The Monster Library, L.L.C. plead that the Court award:

- money damages;
- an injunction requiring a public retraction by Youmna Chamcham and Mini Studio, Inc.;
- an injunction requiring Mini Studio, Inc. to issue Kevin Wansa's 22,500 vested shares; and
- any other relief that the Court deems proper.

Zoho Sign Document ID: 34F4C848-AJYSPYZ2SHZTWLETLCW3UY-RBYW67AE8DMWPMXS8ADG

Respectfully,

*s/Alan Harrison*

Alan Harrison (ct29464)

alan@sandollar-law.net

203.212.9996

Sandollar PLLC

185 Broad Street

Milford, CT 06460

VERIFICATION

"I affirm under penalty of perjury that the allegations in this paper are true and correct to the best of my knowledge, information, or belief, and that I sign this paper of my own free will."

I, Kevin Wansa, being first duly cautioned and sworn, hereby depose and state upon personal knowledge, under penalty of perjury, that the factual allegations contained in the foregoing answer and counterclaims are true and correct to the best of my knowledge, information, or belief.

signed: ......*Kevin Van Witt*............

STATE OF CONNECTICUT, COUNTY OF ............New Haven at Milford............, ..................

Personally appeared Kevin Wansa, Signer of the foregoing instrument, and acknowledged the same to be his free act, before me.

.................................................... date: ............Feb 11 2026 13:41 EST............
Notary Public / Comm'r. Super. Ct.