# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| MINI STUDIO, INC., | : | CIVIL ACTION |
| | : | NO. 3:26-CV-00103-SFR |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| KEVIN WANSA a/k/a KEVIN VAN WITT a/k/a | : | |
| THE MONSTER LIBRARY, AND THE | : | |
| MONSTER LIBRARY, LLC, | : | |
| | : | |
| Defendants. | : | APRIL _, 2026 |

## <u>FIRST AMENDED COMPLAINT</u>

Plaintiff Mini Studio, Inc. ("**Mini Studio**" or "**Plaintiff**"), by and through undersigned counsel, alleges as follows:

### <u>Nature of the Action</u>

1.     This is an action for (1) breach of duty of loyalty, (2) breach of contract, (3) trade secret misappropriation, (4) copyright infringement, and (5) unfair trade practices.

2.     Plaintiff's claims arise from Defendant Kevin Wansa's ("Wansa") disloyalty to Mini Studio during his employment, breach of his contractual obligations to Mini Studio, misappropriation of Mini Studio's confidential and proprietary information and trade secrets, unauthorized copying, use, and exploitation of Mini Studio's copyrighted "PURP" character artwork, and unfair competition.

3.     Defendant Wansa is a former employee of Mini Studio. His employment was terminated when it was discovered that he was surreptitiously competing with Mini Studio while employed by Mini Studio. Following his termination, he has systematically used Mini Studio's confidential and proprietary information to copy Mini Studio's content, and distribute it using the business name The Monster Library.

**Parties**

4.      Plaintiff Mini Studio, Inc. is a Delaware corporation with its principal place of business at One World Trade Center, 85th Floor, c/o Servcorp, New York, NY 10007.

5.      Defendant Kevin Wansa is an individual residing at 5 Short Street, Westport, CT 06880. Defendant Wansa has also held himself out publicly under the name "Kevin Van Witt." Defendant Wansa operated and/or was doing business as "The Monster Library," through which he published and/or monetized audiovisual content online.

6.      On or around September 27, 2024, Wansa organized The Monster Library LLC as a Connecticut limited liability company with a business address of 5 Short Street, Westport, CT 06880. Upon information and belief, The Monster Library LLC thereafter continued, ratified, and/or benefited from the business previously operated by Wansa under the name "The Monster Library."

7.      Upon information and belief, the members of The Monster Library LLC are Wansa, and Mark Monroe, an individual who resides in South Carolina.

8.      At all relevant times, Defendants acted individually and/or in concert and are responsible for the acts alleged herein, including pre-formation acts undertaken by Wansa doing business as "The Monster Library" and post-formation acts undertaken through The Monster Library LLC.

**Jurisdiction and Venue**

9.      This Court has exclusive subject matter jurisdiction over Plaintiff's copyright infringement claim pursuant to 28 U.S.C. §§ 1331 and 1338(a).

10.      This Court has subject matter jurisdiction over Plaintiff's claim of violation of the Defend Trade Secrets Act pursuant to 18 U.S.C. § 1836(c) and 28 U.S.C. § 1331.

2

11.    In addition or in the alternative, this Court has subject matter jurisdiction over all claims pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States.

12.    In addition or in the alternative, this Court has supplemental jurisdiction over all state law claims pursuant to 28 U.S.C. § 1367 because the claims are so related to claims in the action within this Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

13.    Venue is proper in this District pursuant to 28 U.S.C. § 1400(a) and 28 U.S.C. § 1391 because Defendant Wansa resides in this District and may be found in this District.

14.    This Court has personal jurisdiction over Defendants because Defendant Wansa resides in Connecticut and engaged in the conduct complained of herein from Connecticut, and because Defendant The Monster Library LLC is a Connecticut limited liability company.

## **Mini Studio's Business**

15.    Mini Studio is an animation studio that creates animated content for kids and families using human artistry and craftsmanship with the latest AI animation technologies.

16.    Mini Studio's employees write, design, and draw by hand various characters and stories, and then use AI to animate instead of using traditional 3D animation tools.

3

17.    Mini Studio has developed its own original animated content, including the Fuzzlets, a world of fuzzy creatures living in Joyville. Their stories are made to inspire joy, growth and values to kids and families around the world.

## Mini Studio Hires Wansa

18.    On January 18, 2023, Mini Studio hired Wansa in the role of Marketing and Creative Director for Mini Studio pursuant to an "Employment Terms" letter agreement.

19.    As a condition of his employment, Wansa also executed an "Employee Confidential Information and Inventions Assignment Agreement" (CIIAA). A copy of the CIIAA is attached to this Complaint as Exhibit 1.

20.    Under Section 1.1 of the CIIAA, Wansa agreed:

My employment by Company creates a relationship of confidence and trust with respect to Confidential Information (as defined below) and Company has a protectable interest in the Confidential Information. At all times during and after my employment, I will hold in confidence and will not disclose, use, lecture upon, or publish any Confidential Information, except as required in connection with my work for Company, or as approved by an officer of Company. . . I will take all reasonable precautions to prevent the disclosure of Confidential Information. Company information or documentation to which I have access during my employment, regardless of whether it contains Confidential Information, is the property of Company and cannot be downloaded or retained for my personal use or for any use that is outside the scope of my duties for Company.

21.    Under Section 1.4 of the CIIAA, Wansa agreed: "I will only use or disclose Confidential Information and Third Party Information as provided in this Section 1. The restrictions in this Section 1 are intended to and will continue indefinitely, even after my employment by Company ends. . . ."

4

22. Under the CIIAA, "Confidential Information" means "any and all confidential knowledge or data of Company" with limited exceptions not applicable to this case.

23. Under Section 2.4 of the CIIAA, Wansa did "hereby assign to Employer all my right, title, and interest in and to any and all Company Inventions . . . ."

24. Section 2.1(d) defines "Company Inventions" as "any and all Inventions (and all Intellectual Property Rights related to Inventions) that are made, conceived, developed, prepared, produced, authored, edited, amended, reduced to practice, or learned or set out in any tangible medium of expression or otherwise created, in whole or in part, by me, either alone or with others, during my employment by Company, and all printed, physical, and electronic copies, and other tangible embodiments of Inventions."

25. Section 2.1(a) defines "Intellectual Property Rights" as "all past, present and future rights of the following types, which may exist or be created under the laws of any jurisdiction in the world: trade secrets, Copyrights, trademark and trade name rights, mask work rights, patents and industrial property, and all proprietary rights in technology or works of authorship (including, in each case, any application for any such rights, all rights to priority, and any rights to apply for any such rights, as well as all rights to pursue remedies for infringement or violation of any such rights)."

26. Section 2.1(b) defines "Copyright" as "the exclusive legal right to reproduce, perform, display, distribute and make derivative works of a work of authorship (for example, a literary, musical, or artistic work) recognized by the laws of any jurisdiction in the world."

5

27.    Under Section 2.7 of the CIIAA, Wansa agreed: "I acknowledge that all original works of authorship that are made by me (solely or jointly with others) within the scope of my employment and that are protectable by Copyright are "works made for hire," pursuant to United States Copyright Act (17 U.S.C., Section 101)."

28.    Under Section 4 of the CIIAA, Wansa agreed: "I will not, without Company's written consent, directly or indirectly engage in any employment or business activity that is directly or indirectly competitive with, or would otherwise conflict with, my employment by Company."

29.    Under Section 6 of the CIIAA, Wansa agreed:

for the one-year period after the date my employment ends for any reason, including voluntary termination by me or involuntary termination by Company (except as prohibited by law), I will not, directly or indirectly, as an officer, director, employee, consultant, owner, partner, or in any other capacity solicit, perform, or provide, or attempt to perform or provide Conflicting Services (defined above) anywhere in the Restricted Territory (defined below), nor will I assist another person to solicit, perform or provide or attempt to perform or provide Conflicting Services anywhere in the Restricted Territory.

30.    Under Section 9 of the CIIAA, Wansa agreed:

When I cease to be employed by Company or upon Company's earlier request, I will deliver to Company any and all materials, together with all copies thereof, containing or disclosing any Company Inventions, or Confidential Information. I will not copy, delete, or alter any information contained upon my Company computer or Company equipment before I return it to Company. In addition, if I have used any personal computer, server, or e-mail system to receive, store, review, prepare or transmit any Company information, including Confidential Information, I will provide Company with (a) a computer-useable copy of all such information and then permanently delete such information from those systems, and (b) access to my system as reasonably requested to verify that the necessary copying and/or deletion is completed. Any property situated on Company's premises and owned by Company, including disks and other storage media, filing cabinets or other work areas, is subject to inspection by Company's personnel at any time during my employment, with or without notice. Before leaving my employment with Company, I will (i) provide Company any and all information needed to access any Company property or information

6

returned or required to be returned pursuant to this paragraph, including any login, password, and account information, (ii) cooperate with Company in attending an exit interview, and (iii) complete and sign Company's termination statement if required to do so by Company.

**Wansa Learns Mini Studio's Confidential and Proprietary Processes**

31.    While Wansa was employed at Mini Studio, Mini Studio developed specific, non-public creative and technical processes for generating, refining, and maintaining character consistency across its content, including internal prompt libraries, prompt structures, reference-image workflows, internal tool configurations, and post-generation refinement procedures that determined how Mini Studio's characters were designed, refined, and made visually consistent.

32.    These processes were not generic or publicly available instructions. Rather, they were detailed, experience-based creative and technical methods developed collaboratively by Mini Studio through substantial trial and error, used internally in Mini Studio's business, and shared only with personnel who required access in connection with their work for Mini Studio

33.    Wansa learned Mini Studio's confidential processes, and the specific tools and internal methods that Mini Studio used to implement its processes, solely through his role working with Mini Studio. Such information was not publicly available, was not documented publicly, and derived independent economic value from not being generally known to competitors.

34.    Using Mini Studio's processes, Wansa created various multimedia content for Mini Studio.

7

35. In his role at Mini Studio, Wansa also had administrative control and access to Mini Studio's social media accounts, including the Mini Studio Instagram account (@ministudio.ai).

36. Mini Studio's content was posted to various online channels, including its own website, ministudio.ai, and social media sites (TikTok, Facebook, YouTube, X (f/k/a Twitter) and Instagram).

### Wansa's Misconduct During and After His Employment

37. In December 2023, Mini Studio discovered that an unknown person or entity was posting similar types of content to Mini Studio in similar online channels under the name "The Monster Library."

38. In or around December 2023, Wansa began using the Mini Studio Instagram account (@ministudio.ai) to communicate via direct message with The Monster Library Instagram account (@The.Monster.Library).

39. On December 22, 2023, the operator of The Monster Library account wrote via direct message to the Mini Studio Instagram account: "Hey there" "How are you making the videos?"

40. Using the Mini Studio Instagram account, Wansa responded: "We have an internal tool we built. We'd love to get you on it at one point. In the mean time let's find a way to collaborate."

41. Wansa never told anyone at Mini Studio that he was communicating with the operator of The Monster Library Instagram account, or that he was proposing collaborating with the account operator.

8

42.    Upon information and belief, shortly after these communications with The Monster Library Instagram account, Wansa acquired, assumed control over, or otherwise obtained operational control of The Monster Library Instagram account sometime in or around December 2023 to February 2024.

43.    Mini Studio discovered that in or around early February 2024, while Wansa was still employed by Mini Studio, Wansa had the ability to log into and access The Monster Library Instagram account and that such access existed in parallel with his administrative access to Mini Studio's own Instagram and Meta accounts.

44.    Specifically, within Meta's business tools, an account administrator can review the individuals who have access to an associated Instagram account, and can also see the other accounts that such individuals can access.

45.    Below is a screenshot from the Mini Studio Meta business tools page that demonstrates that Wansa simultaneously had access to the Mini Studio Instagram account and The Monster Library Instagram account.



46.    Wansa never told anyone at Mini Studio that he had acquired The Monster Library Instagram account.

47.    Following Wansa's acquisition of the The Monster Library Instagram account, The Monster Library Instagram account made posts that systematically copied the distinctive scenes, settings, characters, visual structures, and overall style of Mini Studio's content using methods and output characteristics consistent with the confidential processes Wansa had learned while employed at Mini Studio..

48.    Depicted below are just a few examples demonstrating Wansa's systematic copying of Mini Studio content:

10



**JANUARY 31, 2024**



**JANUARY 27, 2024**



**FEBRUARY 20, 2024**



**FEBRUARY 16, 2024**

11



**APRIL 12, 2024**

**JANUARY 29, 2024**



**JANUARY 30, 2024**

**JUNE 10, 2024**

49.     On February 16, 2024, Mini Studio's outside counsel at Cooley LLP sent Wansa a written cease-and-desist letter (the "2024 Cease-and-Desist Letter"). The 2024 Cease-and-Desist Letter advised Wansa that Mini Studio had discovered he was unlawfully using and disclosing Mini Studio's confidential information and trade secrets for the benefit of a competing venture branded as "The Monster Library" while still

12

employed by Mini Studio, in violation of his CIIAA and his duty of loyalty. The letter notified Wansa that his employment was being terminated for cause, demanded that he cease all work with The Monster Library and any other competitor, demanded the prompt return of all company equipment and confidential materials, and put him on notice that Mini Studio would pursue legal action, including injunctive relief, if he did not comply.

50.    Upon information belief, when Wansa learned of his termination, he deleted the direct messages between The Mini Studio Instagram account and The Monster Library Instagram account from the Mini Studio Instagram account in an effort to conceal his improper, and disloyal actions.

51.    Despite receiving the 2024 Cease-and-Desist Letter and being expressly instructed to cease all work with The Monster Library and to stop using Mini Studio's confidential information, Defendants continued to operate The Monster Library, and upon information and belief The Monster Library LLC later continued, ratified, and/or benefited from that same course of conduct.

52.    After his termination, upon information and belief, Wansa falsely reported to Meta that various Mini Studio posts were in violation of Meta rules and guidelines, causing Mini Studio's Instagram account to be banned from posting for two days.

53.    In June 2024, The Monster Library created a short video titled "Monster Camp." The "Monster Camp" video systematically copied Mini Studio's content, visual structure and style. The "Monster Camp" video was posted on several social media channels and had over 70 million views on X (f/k/a Twitter).

13

54.    Five investors in Mini Studio flagged to Mini Studio the "Monster Camp" video indicating that they believed that the "Monster Camp" video was created by Mini Studio due to the striking similarities.

55.    As a direct result of Wansa's activities and the continued operation of The Monster Library business, Mini Studio lost valuable opportunities to secure additional investment, business relationships, and licensing opportunities.

56.    Wansa operated as "The Monster Library" through September 2024, when he then organized The Monster Library, LLC as a Connecticut limited liability company.

**Mini Studio's Protected PURP Work**

57.    The main character of the Fuzzlets universe is PURP—a fuzzy purple character with a distinctive silhouette and proportions, facial feature configuration, fur and texture presentation, color treatment, and design and placement of the character's winter hat.

58.    PURP was conceived of by, and reduced to a tangible medium of expression by, Mini Studio employees through a series of hand-drawn images and related human model-sheet development.

59.    Mini Studio is the owner of copyright in the character artwork titled "PURP — Character Model Sheet" (the "**PURP Work**"), which depicts and embodies the protectable expression of the PURP character, including its distinctive silhouette and proportions, facial feature configuration, fur and texture presentation, color treatment, and the design and placement of the character's winter hat.

14

60.    The PURP Work is registered with the United States Copyright Office under Registration No. VAu001569706, with an effective date of registration of January 13, 2026. A copy of the registration is attached as Exhibit 2.

61.    Mini Studio is the author and owner of the PURP Work, which was created as a work made for hire by Mini Studio employees acting within the scope of their employment for Mini Studio.

62.    Mini Studio has continuously owned the rights in the PURP Work since its creation.

63.    Mini Studio has extensively distributed content online embodying the PURP Work.

**<u>Defendants' Infringing Conduct</u>**

64.    Defendants' infringing audiovisual work includes, without limitation, the YouTube video titled "Remi & The Lighthouse: The Storm That Changed Everything" available at the following URL: https://www.youtube.com/watch?v=-4H46BKw3ow (the "Infringing Video").

65.    Defendants created, published, distributed, and publicly displayed the Infringing Video, which contains a character and related expressive elements that are substantially similar to, and unlawfully derived from, Mini Studio's copyrighted PURP Work.

66.    The infringement is not limited to general ideas such as "cute creatures," "children's stories," "forest settings," or "wellness themes." Rather, Defendants' character reproduces protected, concrete expressive choices embodied in Mini Studio's copyrighted character artwork, including the specific combination of the character's

15

proportions and silhouette, facial configuration, color treatment, fur and texture presentation, and the winter hat design and placement.

67.    The PURP character and Mini Studio's FUZZLETS universe were developed and publicly disseminated by Mini Studio prior to Defendants' publication of the Infringing Video.

## CLAIMS FOR RELIEF

### COUNT I —Breach of Duty of Loyalty against Wansa

68.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 65 as if fully set forth herein.

69.    While employed at Mini Studio, Wansa owed Mini Studio a duty of loyalty, including but not limited to duties to act in Mini Studio's best interests, to deal with third parties in the interests of Mini Studio and not himself, to not usurp opportunities of Mini Studio, to not use or disclose confidential information other than for the benefit of Mini Studio, and to not compete with Mini Studio.

70.    Wansa breached his duties to Mini Studio in numerous ways, including but not limited to:

a.    Failing to act in the best interests of Mini Studio at all times;

b.    Surreptitiously communicating with the operator of The Monster Library Instagram account;

c.    Failing to notify Mini Studio about the opportunity to acquire The Monster Library Instagram account;

d.    Acquiring The Monster Library Instagram account;

16

e. Using or disclosing Mini Studio's confidential and proprietary information other than for the benefit of Mini Studio, including by creating content that was similar and competitive with Mini Studio content; and/or

f. Competing with Mini Studio as The Monster Library.

71. Mini Studio has been damaged by Wansa's breaches of his duty loyalty in an amount to be proven at trial.

72. Wansa's actions were knowing, deliberate, and intentional violations of his duties to Mini Studio, and Wansa should be required to disgorge and/or forfeit all the benefits he received as a result of, and during the period of, his disloyal activities, including but not limited being required to disgorge The Monster Library Instagram account, The Monster Library brand, all content he created using Mini Studio's information, disgorgement of any salary and compensation he was paid, and any other profits, revenues, business opportunities, and other benefits derived from The Monster Library account, The Monster Library business, and content created, distributed, or monetized through the misuse of Mini Studio's confidential information .

73. In addition, Mini Studio has been irreparably harmed by Wansa's actions, including by the impairment of Mini Studio's goodwill, reputation, intellectual property, brand, and market for licensing and distribution opportunities.

74. Therefore, Wansa should be preliminarily and/or permanently enjoined from using The Monster Library brand, using The Monster Library Instagram account, and/or creating and posting any multimedia content derived from Mini Studio's Confidential Information.

**COUNT II —BREACH OF CONTRACT**

75.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 72 as if fully set forth herein.

76.    Wansa and Mini Studio entered into the CIIAA.

77.    Mini Studio performed all material obligations required of it under the CIIAA, and, to the extent the Employment Terms letter agreement is relevant to the claims asserted herein, Mini Studio performed all material obligations required of it thereunder.

78.    Wansa has breached his obligations to Mini Studio, including but not limited to by:

   a.  Breaching Section 1 of the CIIAA by disclosing and using Confidential Information other than in connection with his work for Mini Studio, and by retaining Mini Studio's information for uses that were outside the scope of his duties for Mini Studio.

   b.  Breaching Section 4 of the CIIAA by, without Mini Studio's written consent, engaging in employment and/or business activities that are or were competitive with, and conflicted with, his employment by Mini Studio.

   c.  Breaching Section 6 of the CIIAA by directly or indirectly performing, providing, assisting with, and/or continuing Conflicting Services through "The Monster Library" and The Monster Library LLC within the one-year period after the date his employment with Mini Studio ended.

   d.  Breach of Section 9 of the CIIAA by failing to deliver to Mini Studio all of its information upon his termination, and for deleting information

18

without delivering a copy to Mini Studio, including the direct messages in the Mini Studio Instagram account.

79. Mini Studio has been damaged by Wansa's breaches of the CIIAA.

80. In addition, Wansa's breaches have caused and continue to cause Mini Studio to suffer irreparable harm, including, but not limited to, the impairment of its goodwill, reputation, intellectual property, brand, and market for licensing and distribution opportunities.

81. Pursuant to Section 10.2 of the CIIAA, Mini Studio is entitled, to the extent it is successful in whole or in part, to recover from Wansa the costs, fees, and expenses incurred in enforcing the CIIAA, including reasonable attorneys' fees.

## COUNT III — VIOLATION OF DEFEND TRADE SECRETS ACT (18 U.S.C. § 1836) AGAINST WANSA AND THE MONSTER LIBRARY LLC

82. Plaintiff repeats and realleges the allegations in paragraphs 1 through 65 as if fully set forth herein.

83. Mini Studio owns valuable trade secret information, including specific, non-public prompts, creative structures, and workflows that determine how its characters are designed, refined, and made visually consistent.

84. These prompts are not generic instructions but instead are detailed, experience-based creative processes developed collaboratively through internal experimentation, iterative testing, and substantial trial and error, and they are used by Mini Studio to create commercially valuable and distinctive content.

85. Mini Studio's uses its trade secret information in interstate commerce.

19

86.    The specific, non-public prompts, creative structures, and workflows are not generally known or readily ascertainable by others, and are extremely valuable to Mini Studio.

87.    Mini Studio took reasonable measures to keep the information secret, including by requiring its employees to enter into contracts, like the CIIAA, that require employees not to disclose Mini Studio's Confidential Information.

88.    Wansa and The Monster Library LLC misappropriated Mini Studio's trade secret information because Wansa has retained, used, and disclosed the information in breach of his obligations to Mini Studio, including by using such information to create competing content and operate a competing business. Upon information and belief, The Monster Library LLC continued, ratified, and/or benefited from the use of such misappropriated information after its formation and Wansa is a member of The Monster Library LLC and in control of The Monster Library LLC.

89.    Mini Studio has been, and is continuing to be harmed by Defendants misappropriation of its trade secrets.

90.    In addition, Wansa's breaches have caused Mini Studio to suffer irreparable harm, including but not limited to, the impairment of its goodwill, reputation, intellectual property, brand, and market for licensing and distribution opportunities.

**Count IV—VIOLATION OF CONNECTICUT UNIFORM TRADE SECRETS ACT (CONN. GEN. STAT. §§ 35-50 – 35-58) AGAINST WANSA AND THE MONSTER LIBRARY LLC**

91.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 65 as if fully set forth herein.

20

92.    Mini Studio owns valuable trade secret information, including specific, non-public prompts, creative structures, and workflows that determine how its characters are designed, refined, and made visually consistent.

93.    These prompts are not generic instructions but instead are detailed, experience-based creative processes developed collaboratively through trial and error and shared internally as part of Mini Studio's work.

94.    The specific, non-public prompts, creative structures, and workflows are not generally known or readily ascertainable by others, and are extremely valuable to Mini Studio.

95.    Mini Studio took reasonable measures to keep the information secret, including by requiring its employees to enter into contracts, like the CIIAA, that require employees not to disclose Mini Studio's Confidential Information.

96.    Wansa and The Monster Library LLC misappropriated Mini Studio's trade secret information because Wansa has retained, used, and disclosed the information in breach of his obligations to Mini Studio, and Wansa is a member of The Monster Library LLC and in control of The Monster Library LLC.

97.    Mini Studio has been, and is continuing to be harmed by Defendants misappropriation of its trade secrets.

98.    In addition, Wansa's breaches have caused Mini Studio to suffer irreparable harm, including but not limited to, the impairment of its goodwill, reputation, intellectual property, brand, and market for licensing and distribution opportunities.

**COUNT V — COPYRIGHT INFRINGEMENT (17 U.S.C. § 501) AGAINST WANSA AND THE MONSTER LIBRARY LLC**

21

99.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 65 as if fully set forth herein.

100.    Defendants, without authorization, copied protected expression embodied in the PURP Work and created and distributed an infringing and/or derivative audiovisual work, including the Infringing Video located at https://www.youtube.com/watch?v=-4H46BKw3ow.

101.    Exhibit 3 to this Complaint is a document demonstrating the substantial similarity between the Infringing Video and the protected expression embodied in the registered PURP Work. To the extent Exhibit 3 includes additional Mini Studio media, such media is offered solely as illustrative evidence of the same protected PURP character expression embodied in the registered PURP Work.

102.    On or about January 2, 2026, Mini Studio submitted a copyright takedown notice to YouTube under 17 U.S.C. § 512 regarding the Infringing Video. In response, YouTube removed or disabled access to the Infringing Video.

103.    On January 9, 2026, YouTube notified Mini Studio that Defendant Wansa had submitted a counter-notification under 17 U.S.C. § 512(g) contesting the takedown. In that counter-notification, Wansa asserted under penalty of perjury that the removal of the Infringing Video was the result of a mistake or misidentification, claimed that he independently created the video and that it does not copy any copyrighted work owned by Mini Studio, and consented to the jurisdiction of this Court. YouTube's notice stated that, absent evidence of a filed lawsuit seeking to restrain the alleged infringement, YouTube may reinstate the Infringing Video after ten (10) business days.

104. This action is filed within that statutory window and seeks, among other relief, an order restraining Defendants' continued infringement, including distribution of the Infringing Video at https://www.youtube.com/watch?v=-4H46BKw3ow.

105. Defendants' infringement is ongoing and threatens continued harm to Mini Studio's exclusive rights, including rights to prepare derivative works and to control the marketplace for the PURP character and the FUZZLETS universe.

106. Mini Studio lacks an adequate remedy at law because unauthorized online distribution causes immediate and difficult-to-quantify harms, including loss of control, dilution of distinctiveness, and impairment of licensing value.

107. Defendants have infringed Mini Studio's copyrights in violation of 17 U.S.C. § 501, including Mini Studio's exclusive rights under 17 U.S.C. § 106.

108. As a result of Defendants' infringement, Mini Studio has suffered and will continue to suffer damages in an amount to be proven at trial.

109. Defendants' infringement was willful, intentional, and undertaken with knowledge of Mini Studio's rights.

110. Unless restrained by this Court, Defendants will continue to infringe Mini Studio's copyrighted work.

## COUNT VI — VIOLATION OF THE CONNECTICUT UNFAIR TRADE PRACTICES ACT (CONN. GEN. STAT. § 42-110b) AGAINST WANSA AND THE MONSTER LIBRARY LLC

111. Plaintiff repeats and realleges the allegations in paragraphs 1 through 65 as if fully set forth herein.

112. Defendants engaged in unfair acts which resulted in an ascertainable loss of money or property in the conduct of trade or commerce.

23

113.    Defendants' actions are unfair trade practices that (1) offend public policy as evidenced by statutes, common law, or other established fairness concepts; (2) are immoral or unethical; and (3) cause substantial injury to consumers, competitors or other business people.

114.    Mini Studio has been damaged by Defendants' unfair trade practices in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Mini Studio respectfully requests that the Court enter judgment in its favor and against Defendants as follows:

A.    Awarding money damages in Mini Studio's favor on each Count set forth in this Complaint;

B.    Ordering disgorgement of all benefits Defendants received;

C.    Ordering forfeiture of Wansa's compensation and any other benefits he received;

D.    Awarding damages for unjust enrichment for trade secret misappropriation;

E.    Awarding a reasonable royalty for trade secret misappropriation;

F.    An order requiring Defendants to transfer to Mini Studio any social-media accounts, account access, business assets, or brand assets acquired, developed, controlled, or operated through Wansa's breach of duty, breach of contract, or misuse of Mini Studio's Confidential Information or trade secrets;

24

G.   Awarding Mini Studio double, treble, and/or punitive damages as permitted by applicable law, including, but not limited to, the DTSA, CUTSA, and/or CUTPA.

H.   Awarding Mini Studio its attorneys' fees pursuant to the CIIAA, the DTSA, CUTSA, CUTPA, and/or the Copyright Act.

I.   Declaring that Defendants have infringed Mini Studio's copyrights in the PURP Work;

J.   Entering preliminary and permanent injunctive relief, including the following:

a.   An order requiring Defendants to identify all Mini Studio Confidential Information and/or trade secrets in their possession;

b.   An order requiring Defendants to identify all persons or entities to whom they transmitted any Mini Studio Confidential Information and/or trade secrets;

c.   An order restraining Defendants from retaining, using, or disclosing Mini Studio's Confidential Information or trade secrets;

d.   An order enjoining Wansa from, for a period of one-year, directly or indirectly, as an officer, director, employee, consultant, owner, partner, or in any other capacity soliciting, performing, or providing, or attempting to perform or provide Conflicting Services (as defined in the CIIAA) anywhere in the Restricted Territory (as defined in the CIIAA), or assisting another person to solicit, perform or provide or attempt to

25

perform or provide Conflicting Services anywhere in the Restricted Territory.

e. An order requiring Wansa to identify all computers, devices, and/or accounts he used to conduct business as The Monster Library, and to submit to forensic examination of those computers, devices, and/or accounts;

f. An order requiring Defendants to transfer The Monster Library brand to Mini Studio;

g. An order requiring the Defendants to cease all further use of The Monster Library brand;

h. An order requiring the Defendants to turn over access to all social media accounts used by Wansa and/or The Monster Library LLC that have been used to compete with Mini Studio to Mini Studio;

i. An order enjoining Defendants from copying, distributing, displaying, exploiting, or creating derivative works based on the PURP Work and the PURP character expression embodied therein, including continued distribution of the Infringing Video at https://www.youtube.com/watch?v=-4H46BKw3ow;

j. An order ordering Defendants to remove, disable access to, and/or cease distribution of infringing materials within their control;

K. Awarding Mini Studio damages pursuant to 17 U.S.C. §§ 504 and 505, including statutory damages to the extent available, and attorneys' fees and costs; and

L. Awarding such other and further relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a

trial by jury on all issues triable as such.

PLAINTIFF – MINI STUDIO, INC.

*/s/ Damian K. Gunningsmith*
Damian K. Gunningsmith
Federal Bar No. ct29430
CARMODY TORRANCE SANDAK &
HENNESSEY LLP
195 Church Street
P.O. Box 1950
New Haven, CT 06509-1950
Phone: (203) 777-5501
Fax: (203) 784-3199
dgunningsmith@carmodylaw.com

# EXHIBIT 1

**EMPLOYEE CONFIDENTIAL INFORMATION**

**AND INVENTIONS ASSIGNMENT AGREEMENT**

In consideration of my employment or continued employment by Mini Studio Inc. ("*Employer*"), and its subsidiaries, parents, affiliates, successors, and assigns (together with Employer, "*Company*"), the compensation paid to me now and during my employment with Company, and Company's agreement to provide me with access to its Confidential Information (as defined below), I enter into this Employee Confidential Information and Inventions Assignment Agreement with Employer (the "*Agreement*").

A. During the course of my employment, I will have access to and knowledge of Company's trade secrets and Confidential Information; and

B. It is of material benefit to restrict the disclosure of Company's trade secrets and Confidential Information with a nondisclosure, non-solicitation, and non-competition agreement, all of which are reasonable in terms of scope, geography and duration.

Accordingly, in consideration of the mutual promises and covenants contained herein, Employer (on behalf of itself and Company) and I agree as follows:

**1.    Confidential Information Protections**.

1.1    **Recognition of Company's Rights; Nondisclosure**.  My employment by Company creates a relationship of confidence and trust with respect to Confidential Information (as defined below) and Company has a protectable interest in the Confidential Information. At all times during and after my employment, I will hold in confidence and will not disclose, use, lecture upon, or publish any Confidential Information, except as required in connection with my work for Company, or as approved by an officer of Company.  I will obtain written approval by an officer of Company before I lecture on or submit for publication any material (written, oral, or otherwise) that discloses and/or incorporates any Confidential Information.  I will take all reasonable precautions to prevent the disclosure of Confidential Information.  Notwithstanding the foregoing, pursuant to 18 U.S.C. Section 1833(b), I will not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that: (1) is made in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney, and solely for the purpose of reporting or investigating a suspected violation of law; or (2) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.  Company information or documentation to which I have access during my employment, regardless of whether it contains Confidential Information, is the property of Company and cannot be downloaded or retained for my personal use or for any use that is outside the scope of my duties for Company.

1.2    **Confidential Information**.  "*Confidential Information*" means any and all confidential knowledge or data of Company, and includes any confidential knowledge or data that Company has received, or receives in the future, from third parties that Company has agreed to treat as confidential and to use for only certain limited purposes. By way of illustration but not limitation, Confidential Information includes (a) trade secrets, inventions, ideas, processes, formulas, software in source or object code, data, technology, know-how, designs and techniques, and any other work product of any nature, and all Intellectual Property Rights (defined below) in all of the foregoing (collectively, "*Inventions*"), including all Company Inventions (defined in Section 2.1); (b) information regarding research, development, new products, business and operational plans, budgets, unpublished financial statements and projections, costs, margins, discounts, credit terms, pricing, quoting procedures, future plans and strategies, capital-raising plans, internal services, suppliers and supplier information; (c) information about customers and potential customers of Company, including customer lists, names, representatives, their needs or desires with respect to the types of products or services offered by Company, and other non-public information; (d) information about Company's business partners and their services, including names, representatives, proposals, bids, contracts, and the products and services they provide; (e) information regarding personnel, employee lists, compensation, and employee skills; and (f) any other non-public information that a competitor of Company could use to Company's competitive disadvantage. However, Company agrees that I am free to use information that I knew before my employment with Company or that is, at the time of use, generally known in the trade or industry through no breach of this Agreement by me.

1.3  **Third Party Information**.  I understand, in addition, that Company has received and in the future will receive from third parties their confidential and/or proprietary knowledge, data or information (**"*Third Party Information*"**) subject to a duty on Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes.  During my employment and thereafter, I will hold Third Party Information in confidence and will not disclose to anyone (other than Company personnel who need to know such information in connection with their work for Company) or use, except in connection with my work for Company, Third Party Information unless expressly authorized by an officer of Company in writing.

1.4  **Term of Nondisclosure Restrictions**.  I will only use or disclose Confidential Information and Third Party Information as provided in this Section 1. The restrictions in this Section 1 are intended to and will continue indefinitely, even after my employment by Company ends. However, if a time limitation on my obligation not to use or disclose Confidential Information and Third Party Information is required under applicable law, and the Agreement or its restriction(s) cannot otherwise be enforced, the two-year period after the date my employment ends will be the time limitation relevant to the contested restriction; *provided, however*, that my obligation not to disclose or use trade secrets that are protected without time limitation under applicable law will continue indefinitely.

1.5  **No Improper Use of Information of Prior Employers and Others**.  During my employment by Company, I will not improperly use or disclose confidential information or trade secrets, if any, of any former employer or any other person to whom I have an obligation of confidentiality, and I will not bring onto Company's premises any unpublished documents or property belonging to a former employer or any other person to whom I have an obligation of confidentiality unless that former employer or person has consented in writing.

1.6  **Restricted Access Granted.**  In exchange for my agreement not to disclose or use Confidential Information or Third Party Information, except as required in performing my duties for Company, and for the non-solicitation covenants, and the other promises provided herein, Company will grant me access to Confidential Information or Third Party Information required to fulfill the duties of my position as determined by Company.  I agree that Company has no pre-existing obligation to reveal Confidential Information or Third Party Information.

**2.**  **Assignments of Inventions**.

2.1  **Definitions**.  The term (a) **"*Intellectual Property Rights*"** means all past, present and future rights of the following types, which may exist or be created under the laws of any jurisdiction in the world: trade secrets, Copyrights, trademark and trade name rights, mask work rights, patents and industrial property, and all proprietary rights in technology or works of authorship (including, in each case, any application for any such rights, all rights to priority, and any rights to apply for any such rights, as well as all rights to pursue remedies for infringement or violation of any such rights); (b) "*Copyright*" means the exclusive legal right to reproduce, perform, display, distribute and make derivative works of a work of authorship (for example, a literary, musical, or artistic work) recognized by the laws of any jurisdiction in the world; (c) "*Moral Rights*" means all paternity, integrity, disclosure, withdrawal, special and similar rights recognized by the laws of any jurisdiction in the world; and (d) "*Company Inventions*" means any and all Inventions (and all Intellectual Property Rights related to Inventions) that are made, conceived, developed, prepared, produced, authored, edited, amended, reduced to practice, or learned or set out in any tangible medium of expression or otherwise created, in whole or in part, by me, either alone or with others, during my employment by Company, and all printed, physical, and electronic copies, and other tangible embodiments of Inventions.

2.2  **Non-Assignable Inventions**. I recognize that this Agreement will not be deemed to require assignment of any Invention that I develop entirely on my own time without using Company's equipment, supplies, facilities or trade secrets, or Confidential Information, except for Inventions that either (i) relate to Company's actual or anticipated business, research or development, or (ii) result from or are connected with any work performed by me for Company. In addition, this Agreement does not apply to any Invention that qualifies fully for protection from assignment to Employer under any specifically applicable state or district law, regulation, rule or public policy, as more specifically described in **Exhibit A** for employees working in certain jurisdictions (collectively, "*Nonassignable Inventions*").

2.3  **Prior Inventions**.

(a)  On the signature page to this Agreement is a list describing any Inventions that (i) are owned by me or in which I have an interest and that were made or acquired by me before my date of first employment by Company,

and (ii) may relate to Company's business or actual or demonstrably anticipated research or development, and (iii) are not to be assigned to Company ("***Prior Inventions***").  If no such list is attached, I agree, represent and warrant that no Inventions that would be classified as Prior Inventions exist as of the date of this Agreement.

**(b)**      If I use any Prior Inventions and/or Nonassignable Inventions in the scope of my employment, or if I include any Prior Inventions and/or Nonassignable Inventions in any product or service of Company, or if my rights in any Prior Inventions and/or any Nonassignable Inventions may block or interfere with, or may otherwise be required for, the exercise by Company of any rights assigned to Company under this Agreement (each, a "***License Event***"), (i) I will immediately notify Company in writing, and (ii) unless Company and I agree otherwise in writing, I hereby grant to Company a non-exclusive, perpetual, transferable, fully-paid, royalty-free, irrevocable, worldwide license, with rights to sublicense through multiple levels of sublicensees, to reproduce, make derivative works of, distribute, publicly perform, and publicly display in any form or medium (whether now known or later developed), make, have made, use, sell, import, offer for sale, and exercise any and all present or future rights in, such Prior Inventions and/or Nonassignable Inventions. To the extent that any third parties have any rights in or to any Prior Inventions or any Nonassignable Inventions, I represent and warrant that such third party or parties have validly and irrevocably granted to me the right to grant the license stated above.  For purposes of this Section 2.3(b), "***Prior Inventions***" includes any Inventions that would be classified as Prior Inventions, whether or not they are listed on the signature page to this Agreement.

2.4   **Assignment of Company Inventions**.  I hereby assign to Employer all my right, title, and interest in and to any and all Company Inventions other than Nonassignable Inventions and agree that such assignment includes an assignment of all Moral Rights.  To the extent such Moral Rights cannot be assigned to Employer and to the extent the following is allowed by the laws in any country where Moral Rights exist, I hereby unconditionally and irrevocably waive the enforcement of such Moral Rights, and all claims and causes of action of any kind against Employer or related to Employer's customers, with respect to such rights.  Neither my successors-in-interest nor legal heirs retain any Moral Rights in any Company Inventions.  Nothing contained in this Agreement may be construed to reduce or limit Company's rights, title, or interest in any Company Inventions so as to be less in any respect than that Company would have had in the absence of this Agreement.

2.5   **Obligation to Keep Company Informed**.  During my employment by Company, I will promptly and fully disclose to Company in writing all Inventions that I author, conceive, or reduce to practice, either alone or jointly with others.  At the time of each disclosure, I will advise Company in writing of any Inventions that I believe constitute Nonassignable Inventions; and I will at that time provide to Company in writing all evidence necessary to substantiate my belief. Subject to Section 2.3(b), Company agrees to keep in confidence, not use for any purpose, and not disclose to third parties without my consent, any confidential information relating to Nonassignable Inventions that I disclose in writing to Company.

2.6   **Government or Third Party**.  I agree that, as directed by Company, I will assign to a third party, including the United States, all my right, title, and interest in and to any particular Company Invention.

2.7   **Ownership of Work Product**. I acknowledge that all original works of authorship that are made by me (solely or jointly with others) within the scope of my employment and that are protectable by Copyright are "works made for hire," pursuant to United States Copyright Act (17 U.S.C., Section 101).

2.8   **Enforcement of Intellectual Property Rights and Assistance**.  I will assist Company, in every way Company requests, including signing, verifying and delivering any documents and performing any other acts, to obtain and enforce United States and foreign Intellectual Property Rights and Moral Rights relating to Company Inventions in any jurisdictions in the world.  My obligation to assist Company with respect to Intellectual Property Rights relating to Company Inventions will continue beyond the termination of my employment, but Company will compensate me at a reasonable rate after such termination for the time I actually spend on such assistance.  If Company is unable for any reason, after reasonable effort, to secure my signature on any document needed in connection with the actions specified in this paragraph, I hereby irrevocably designate and appoint Employer and its duly authorized officers and agents as my agent and attorney in fact, which appointment is coupled with an interest, to act for and on my behalf to execute, verify and file any such documents and to do all other lawfully permitted acts to further the purposes of this Agreement with the same legal force and effect as if executed by me.  I hereby waive and quitclaim to Company any and all claims, of any nature whatsoever, which I now or may hereafter have for infringement of any Intellectual Property Rights assigned to Employer under this Agreement.

2.9   **Incorporation of Software Code**.  I will not incorporate into any Inventions, including any Company software, or otherwise deliver to Company, any software code licensed under the GNU General Public License, Lesser General Public License, or any other license that, by its terms, requires or conditions the use or distribution of such code on the disclosure, licensing, or distribution of any source code owned or licensed by Company, **except** in strict compliance with Company's policies regarding the use of such software or as specifically directed by Company.

**3.**   **Records**.  I will keep and maintain adequate and current records (in the form of notes, sketches, drawings and in any other form that is required by Company) of all Confidential Information developed by me and all Company Inventions made by me during the period of my employment at Company, which records will be available to and remain the sole property of Employer at all times.

**4.**   **Duty of Loyalty During Employment**.  To the extent applicable to me or modified for me as described in **Exhibit B** based on the jurisdiction in which I work, during my employment by Company, I will not, without Company's written consent, directly or indirectly engage in any employment or business activity that is directly or indirectly competitive with, or would otherwise conflict with, my employment by Company.

**5.**   **No Solicitation of Employees, Consultants, Contractors, or Customers or Potential Customers**.  To the extent applicable to me or modified for me as described in **Exhibit C** based on the jurisdiction in which I work, and subject to future modification by Section 10.3, during the period of my employment and for the one-year period after the date my employment ends for any reason, including voluntary termination by me or involuntary termination by Company, I will not, as an officer, director, employee, consultant, owner, partner, or in any other capacity, either directly or through others, except on behalf of Company:

5.1   solicit, induce, encourage, or participate in soliciting, inducing or encouraging any person then employed by Company or who has left the employment of Company within the preceding six months, or any person or entity engaged by Company as a consultant or independent contractor or who/which has ceased a service relationship with Company within the preceding six months, to terminate such person's or entity's relationship with Company, even if I did not initiate the discussion or seek out the contact;

5.2   solicit, induce, encourage, or participate in soliciting, inducing, or encouraging any person then employed by Company or who has left the employment of Company within the preceding six months, or any person or entity engaged by Company as a consultant or independent contractor or who/which has ceased a service relationship with Company within the preceding six months, to terminate such person's or entity's relationship with Company to render services to me or any other person or entity that researches, develops, markets, sells, performs or provides or is preparing to develop, market, sell, perform or provide Conflicting Services (as defined below);

5.3   hire or attempt to hire any person who is an employee, consultant, or independent contractor of Company, even if I did not initiate the discussion or seek out the contact;

5.4   hire, employ, or engage any person then employed by Company or who has left the employment of Company within the preceding six months in a business venture as partners or owners or other joint capacity, or attempt to hire, employ, or engage any person then employed by Company or who has left the employment of Company within the preceding six months in a business venture as partners or owners or other joint capacity;

5.5   solicit, induce, encourage, or participate in an attempt to induce any Customer or Potential Customer (as defined below), to terminate, diminish, or materially alter in a manner harmful to Company its relationship with Company;

5.6   solicit or assist in the solicitation of any Customer or Potential Customer to induce or attempt to induce such Customer or Potential Customer to purchase or contract for any Conflicting Services;

5.7   solicit, induce, encourage or attempt to solicit, induce, or encourage, any franchisee, joint venture, supplier, vendor or contractor who conducted business with Company at any time during the two-year period before the termination of my employment with Company, to terminate or adversely modify any business relationship with Company or not to proceed with, or enter into, any business relationship with Company, nor will I otherwise interfere with any business relationship between Company and any such franchisee, joint venture, supplier, vendor or contractor; or

5.8  perform, provide or attempt to perform or provide any Conflicting Services for a Customer or Potential Customer (except as prohibited by law).

For purposes of this Agreement: (a) a "*Customer or Potential Customer*" is any person or entity who or which used or inquired of Company's services at any time during the two-year period preceding the termination of my employment with Company; and (b) "*Conflicting Service*s" means any product, service, or process or the research and development thereof, of any person or organization other than Company that competes with a product, service, or process, including the research and development thereof, of Company with which I worked directly or indirectly during my employment by Company or about which I acquired Confidential Information during my employment by Company.

**6.  Non-Compete Provision**.

6.1  To the extent applicable to me or modified for me as described in **Exhibit D** based on the jurisdiction in which I work, and subject to any future modification by Section 10.3, for the one-year period after the date my employment ends for any reason, including voluntary termination by me or involuntary termination by Company (except as prohibited by law), I will not, directly or indirectly, as an officer, director, employee, consultant, owner, partner, or in any other capacity solicit, perform, or provide, or attempt to perform or provide Conflicting Services (defined above) anywhere in the Restricted Territory (defined below), nor will I assist another person to solicit, perform or provide or attempt to perform or provide Conflicting Services anywhere in the Restricted Territory.

6.2  The parties agree that, for purposes of this Agreement, "*Restricted Territory*" means (a) all counties in the state or district in which I primarily perform services for Company; (b) all other states or districts of the United States of America in which Company provided goods or services, had customers, or otherwise conducted business at any time during the two-year period before the date of the termination of my relationship with Company; and (c) any other countries from which Company provided goods or services, had customers, or otherwise conducted business at any time during the two-year period before the date of the termination of my relationship with Company.

**7.  Reasonableness of Restrictions**.  I have read this entire Agreement and understand it. I acknowledge that (a) I have the right to consult with counsel before signing this Agreement, (b) I will derive significant value from Company's agreement to provide me with Company Confidential Information to enable me to optimize the performance of my duties to Company, and (c) that my fulfillment of the obligations contained in this Agreement, including my obligation neither to disclose nor to use Company Confidential Information other than for Company's exclusive benefit and my obligations not to compete and not to solicit are necessary to protect Company Confidential Information and, consequently, to preserve the value and goodwill of Company.  I agree that (i) this Agreement does not prevent me from earning a living or pursuing my career, and (ii) the restrictions contained in this Agreement are reasonable, proper, and necessitated by Company's legitimate business interests.  I represent and agree that I am entering into this Agreement freely, with knowledge of its contents and the intent to be bound by its terms.  If a court finds this Agreement, or any of its restrictions, are ambiguous, unenforceable, or invalid, Company and I agree that the court will read the Agreement as a whole and interpret such restriction(s) to be enforceable and valid to the maximum extent allowed by law.  If the court declines to enforce this Agreement in the manner provided in this Section 7 and/or Section 13.2, Company and I agree that this Agreement will be automatically modified to provide Company with the maximum protection of its business interests allowed by law, and I agree to be bound by this Agreement as modified.

**8.  No Conflicting Agreement or Obligation**.  I represent that my performance of all the terms of this Agreement and as an employee of Company does not and will not breach any agreement to keep in confidence information acquired by me in confidence or in trust before my employment by Company.  I have not entered into, and I agree I will not enter into, any written or oral agreement in conflict with this Agreement.

**9.  Return of Company Property**.  When I cease to be employed by Company or upon Company's earlier request, I will deliver to Company any and all materials, together with all copies thereof, containing or disclosing any Company Inventions, or Confidential Information.  I will not copy, delete, or alter any information contained upon my Company computer or Company equipment before I return it to Company.  In addition, if I have used any personal computer, server, or e-mail system to receive, store, review, prepare or transmit any Company information, including Confidential Information, I will provide Company with (a) a computer-useable copy of all such information and then permanently delete such information from those systems, and (b) access to my system as reasonably requested to verify that the necessary copying and/or deletion

is completed.  Any property situated on Company's premises and owned by Company, including disks and other storage media, filing cabinets or other work areas, is subject to inspection by Company's personnel at any time during my employment, with or without notice.  Before leaving my employment with Company, I will (i) provide Company any and all information needed to access any Company property or information returned or required to be returned pursuant to this paragraph, including any login, password, and account information, (ii) cooperate with Company in attending an exit interview, and (iii) complete and sign Company's termination statement if required to do so by Company.

## 10.  Legal and Equitable Remedies.

10.1    It may be impossible to assess the damages caused by my violation of this Agreement or any of its terms. Accordingly, in addition to any remedies available under applicable law and/or as set forth in any equity agreements between me and Company (including option grant notices), any threatened or actual violation of this Agreement or any of its terms will constitute immediate and irreparable injury to Company, and Company will have the right to enforce this Agreement and any of its provisions by injunction, specific performance or other equitable relief, without bond and without prejudice to any other rights and remedies that Company may have for a breach or threatened breach of this Agreement.

10.2    Except as prohibited by law or any agreement between Company and me regarding payment of fees charged by an arbitral body, if Company is successful in whole or in part in any legal or equitable action under this Agreement (including a court partially or fully granting any application, motion, or petition by Company for injunctive relief, including a temporary restraining order, preliminary injunction, or permanent injunction), whether against or commenced by me, Company will be entitled to recover from me all costs, fees, or expenses it incurred at any time during the course of the dispute, including reasonable attorney's fees.  A final resolution of such dispute or a final judgment is not a prerequisite to Company's right to demand payment hereunder and such amounts must be paid by me to Company within 30 days after I receive written notice of such demand.  If Company demands only a portion of such costs, fees, or expenses incurred, such demand will be without prejudice to further demands for (a) the remainder of any outstanding costs, fees, or expenses incurred, or (b) costs, fees, or expenses incurred after the prior demand.

10.3    If Company enforces this Agreement through a court order, the restrictions of Sections 5 and 6 will remain in effect for a period of twelve months from the effective date of the order enforcing the Agreement.

**11.  Notices**.  Any notices required or permitted under this Agreement may be sent by certified or registered mail, courier, express mail, or email delivery. Notices will be given to Company at its headquarters location at the time notice is given, labeled "Attention Chief Executive Officer," and to me at my address as listed on Company payroll, or at such other address as Company or I may designate by written notice to the other.  Notice will be effective upon receipt or refusal of delivery. If delivered by certified or registered mail, notice will be considered to have been given five business days after it was mailed, as evidenced by the postmark.  If delivered by courier or express mail service, notice will be considered to have been given on the delivery date reflected by the courier or express mail service receipt. If delivered by email, notice will be considered to have been given upon either receipt of: (i) an acknowledgment or receipt by the recipient of the email, or (ii) electronic confirmation that said email has been opened by the recipient.

**12.  Publication of This Agreement to Subsequent Employer or Business Associates of Employee**.  If I am offered employment, or the opportunity to enter into any business venture as owner, partner, consultant or other capacity, while the restrictions in Sections 5 and 6 are in effect, I will inform my potential employer, partner, co-owner and/or others involved in managing the business I have an opportunity to be associated with, of my obligations under this Agreement and to provide such person or persons with a copy of this Agreement. I will inform Company of all employment and business ventures which I enter into while the restrictions described in Sections 5 and 6 are in effect and I authorize Company to provide copies of this Agreement to my employer, partner, co-owner and/or others involved in managing the business I have an opportunity to be associated with and to make such persons aware of my obligations under this Agreement.

## 13.  General Provisions.

13.1 **Governing Law; Consent to Personal Jurisdiction; Notice of Change to Work Location**.  This Agreement will be governed by and construed according to the laws of the state or district in which I primarily work for Company

without regard to any conflict of laws principles that would require the application of the laws of a different jurisdiction.  I expressly consent to the personal jurisdiction and venue of the state and federal courts located in the state or district in which I primarily work for Company and the state or district in which Company's headquarters is located for any lawsuit filed there against me by Company arising from or related to this Agreement (although I understand Company will not file a lawsuit in the state or district in which Company's headquarters is located if prohibited by applicable law).  I will not change the state or district where I am primarily working for the Company without providing prior written notice to the Company of such change (other than in the case of any such change requested or required of me by the Company).

13.2   **Severability**.  In case any one or more of the provisions, subsections, or sentences contained in this Agreement will, for any reason, be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability will not affect the other provisions of this Agreement, and this Agreement will be construed as if such invalid, illegal or unenforceable provision had never been contained in this Agreement.  If moreover, any one or more of the provisions contained in this Agreement will for any reason be held to be excessively broad as to duration, geographical scope, activity or subject, it will be construed by limiting and reducing it, so as to be enforceable to the extent compatible with the applicable law as it will then appear.

13.3   **Successors and Assigns**.  This Agreement is for my benefit and the benefit of Company, its successors, assigns, parent corporations, subsidiaries, affiliates, and purchasers, and will be binding upon my heirs, executors, administrators and other legal representatives.  Notwithstanding anything to the contrary herein, Company may assign this Agreement and its rights and obligations under this Agreement to any successor to all or substantially all of Company's relevant assets, whether by merger, consolidation, reorganization, reincorporation, sale of assets or stock, or otherwise.  For avoidance of doubt, Company's successors and assigns are authorized to enforce Company's rights under this Agreement.

13.4   **Survival**.  This Agreement will survive the termination of my employment, regardless of the reason, and the assignment of this Agreement by Company to any successor in interest or other assignee.

13.5   **Employment At-Will**.   I understand and agree that nothing in this Agreement will change my at-will employment status or confer any right with respect to continuation of employment by Company, nor will it interfere in any way with my right or Company's right to terminate my employment at any time, with or without cause or advance notice, except as prohibited by law.

13.6   **Waiver**.  No waiver by Company of any breach of this Agreement will be a waiver of any preceding or succeeding breach.  No waiver by Company of any right under this Agreement will be construed as a waiver of any other right.  Company will not be required to give notice to enforce strict adherence to all terms of this Agreement.

13.7   **Export**.  I will not export, reexport, or transfer, directly or indirectly, any U.S. technical data acquired from Company or any products utilizing such data, in violation of the United States export laws or regulations.

13.8   **Counterparts**.  This Agreement may be executed in two or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument. Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, Uniform Electronic Transactions Act or other applicable law) or other transmission method and any counterpart so delivered will be deemed to have been duly and validly delivered and be valid and effective for all purposes.

13.9   **Advice of Counsel**.  **I ACKNOWLEDGE THAT, IN EXECUTING THIS AGREEMENT, I HAVE HAD THE RIGHT TO SEEK THE ADVICE OF INDEPENDENT LEGAL COUNSEL, AND I HAVE READ AND UNDERSTOOD ALL OF THE TERMS AND PROVISIONS OF THIS AGREEMENT.  THIS AGREEMENT WILL NOT BE CONSTRUED AGAINST ANY PARTY BY REASON OF THE DRAFTING OR PREPARATION OF THIS AGREEMENT.**

13.10   **Entire Agreement**.  The obligations in Sections 1 and 2 (except Section 2.2 and Section 2.7, with respect to a consulting relationship) will apply to any time during which I was previously engaged, or am in the future engaged, by Company as a consultant, employee or other service provider if no other agreement governs nondisclosure and assignment of inventions during such period. This Agreement, together with the Exhibits herein and any executed written offer letter between me and Company, is the final, complete and exclusive agreement between me and Company with respect to the subject matter of this Agreement and supersedes and merges all prior discussions between us, whether written or oral; *provided*, *however*, if, before execution of this Agreement, Company and I were parties to any agreement regarding the

subject matter hereof, that agreement will be superseded by this Agreement prospectively only, except that any restrictive covenant provisions of such agreement will not be superseded and will remain in effect and enforceable without limiting or affecting the provisions of this Agreement.  No modification of or amendment to this Agreement will be effective unless in writing and signed by the party to be charged.  Any subsequent change or changes in my duties, salary or compensation will not affect the validity or scope of this Agreement.

13.11 **Interpretation**. For purposes of this Agreement, whenever the context requires the singular number includes the plural, and vice versa; the masculine gender includes the feminine and neuter genders; the feminine gender includes the masculine and neuter genders; and the neuter gender includes the masculine and feminine genders; and any references to sections (unless otherwise specified otherwise) refer to sections of this Agreement.  The parties to this Agreement agree that any rule of construction to the effect that ambiguities are to be resolved against the drafting party will not be applied in the construction or interpretation of this Agreement.  As used in this Agreement, the words "include" and "including," and variations thereof, will not be deemed to be terms of limitation, but rather will be deemed to be followed by the words "without limitation."

13.12 **Protected Activity Not Prohibited**.  I understand that nothing in this Agreement limits or prohibits me from filing a charge or complaint with, or otherwise communicating or cooperating with or participating in any investigation or proceeding that may be conducted by law enforcement or any federal, state or local government agency, entity, or commission that enforces anti-discrimination laws, including the Securities and Exchange Commission, the Equal Employment Opportunity Commission, the Occupational Safety and Health Administration, and the National Labor Relations Board (**"*Government Agencies*"**), including disclosing documents or other information as permitted by law, without giving notice to, or receiving authorization from, Company; otherwise discussing the terms and conditions of my employment with others to the extent expressly permitted by Section 7 of the National Labor Relations Act; or to the extent that such disclosure is protected under the applicable provisions of law or regulation, including but not limited to "whistleblower" statutes or other similar provisions that protect such disclosure, provided that (a) in each case such communications and disclosures are consistent with applicable law and (b) the information subject to such disclosure was not obtained by me through a communication that was subject to the attorney client privilege or otherwise constitutes attorney work product, unless such disclosure of that information would otherwise be permitted by an attorney pursuant to 17 C.F.R. 205.3(d)(2), applicable state attorney conduct rules, or otherwise. I also understand that nothing in this Agreement prohibits me from discussing or disclosing information that is expressly prohibited from being the subject of employee nondisclosure obligations under applicable law, such as information about possible or actual unlawful acts in the workplace, including harassment or any other conduct or violation of any U.S. federal, state or local law, regulation, or public policy, or from speaking with an attorney regarding the same. Notwithstanding, in making any such disclosures or communications, I agree to take all reasonable precautions to prevent any unauthorized use or disclosure of any information that may constitute Company Confidential Information to any parties other than the Government Agencies. Any agreement in conflict with the foregoing is hereby deemed amended to be consistent with the foregoing Paragraph 13.12.

*[Signatures to follow on next page]*

This Agreement will be effective as of the date signed by the employee below.

**EMPLOYER:**                                     **EMPLOYEE:**

*Youmna Chamcham*                                *Kevin Wansa*

(Signature)                                      (Signature)

Youmna Chamcham                                  Kevin Wansa (Kevin Van Witt)

(Printed Name)                                   (Printed Name)

Chief Executive Officer                          January 18, 2023

(Title)                                          (Date Signed)

---

### PRIOR INVENTIONS

**1.    Prior Inventions Disclosure**.  Except as listed in Section 2 below, the following is a complete list of all Prior Inventions:

[X]    No Prior Inventions.

[ ]    See below:

_____

_____

_____

[ ]    Additional sheets attached.

**2.**    Due to a prior confidentiality agreement, I cannot complete the disclosure under Section 1 above with respect to the Prior Inventions generally listed below, the intellectual property rights and duty of confidentiality with respect to which I owe to the following party(ies):

| **Excluded Invention** | **Party(ies)** | **Relationship** |
|---|---|---|
| 1. | | |
| 2. | | |
| 3. | | |

[ ]    Additional sheets attached.

## EXHIBIT A

### JURISDICTION-SPECIFIC IP ASSIGNMENT NOTIFICATIONS (AS APPLICABLE)

### For California Employees Only

**THIS IS TO NOTIFY** you in accordance with Cal. Lab. Code § 2870, this Agreement between you and Employer does not apply to an invention that you developed entirely on your own time without using Employer's equipment, supplies, facilities, or trade secret information, except for those inventions that either:

(1) Relate at the time of conception or use to Employer's business, or actual or demonstrably anticipated research or development; or

(2) Result from any work you perform for Employer.

To the extent a provision in the foregoing Agreement purports to require you to assign an invention otherwise excluded from the preceding paragraph, the provision is against the public policy of this state and is void and unenforceable.

### For Delaware Employees Only

**THIS IS TO NOTIFY** you in accordance with Del. Code Ann., Title 19, § 805 that the Agreement between you and Employer does not require you to assign or offer to assign to Employer any of your rights in an invention that you develop entirely on your own time without using Employer's equipment, supplies, facilities or trade secret information, except for those inventions that either:

(1) Relate to Employer's business, or actual or demonstrably anticipated research or development; or

(2) Result from any work performed by you for Employer.

To the extent a provision in the foregoing Agreement purports to require you to assign an invention otherwise excluded from the preceding paragraph, the provision is against the public policy of this state and is void and unenforceable.

### For Illinois Employees Only

**THIS IS TO NOTIFY** you in accordance with Chapter 765 Section 1060/2 of the Illinois Compiled Statutes that the foregoing Agreement between you and Employer does not require you to assign or offer to assign to Employer any invention that you developed entirely on your own time without using Employer's equipment, supplies, facilities or trade secret information except for those inventions that either:

(1) Relate to Employer's business, or actual or demonstrably anticipated research or development of Employer; or

(2)  Result from any work performed by you for Employer.

To the extent a provision in the foregoing Agreement purports to require you to assign an invention otherwise excluded from the preceding paragraph, the provision is against the public policy of this state and is void and unenforceable.

## For Kansas Employees Only

**THIS IS TO NOTIFY** you in accordance with K.S.A. § 44-130(a), this Agreement between you and Employer does not apply to an invention for which no equipment, supplies, facilities, or trade secret information of Employer was used and that you developed entirely on your own time, unless the invention either:

(1) Relates to Employer's business, or actual or demonstrably anticipated research or development; or

(2) Results from any work you perform for Employer.

To the extent a provision in the foregoing Agreement purports to require you to assign an invention otherwise excluded from the preceding paragraph, the provision is against the public policy of this state and is void and unenforceable.

## For Minnesota Employees Only

**THIS IS TO NOTIFY** you in accordance with Section 181.78 of the Minnesota Statutes that the foregoing Agreement between you and Employer will not apply to an invention for which no equipment, supplies, facility or trade secret information of Employer was used and which was developed entirely on your own time, and:

(1) Does not relate (a) directly to the business of Employer or (b) to Employer's actual or demonstrably anticipated research or development, or

(2) Does not result from any work performed by you for Employer.

To the extent a provision in the foregoing Agreement purports to require you to assign an invention otherwise excluded from the preceding paragraph, the provision is against the public policy of this state and is void and unenforceable.

## For Nevada Employees Only

**THIS IS TO NOTIFY** you in accordance with NRS § 600.500, unless there is an express written agreement to the contrary, Employer is the sole owner of any "patentable invention or trade secret" developed by you during the course and scope of your employment that relates directly to work performed during the course and scope of employment.

## For New Jersey Employees Only

**THIS IS TO NOTIFY** you in accordance with Section 34:1B-265 of the New Jersey Statutes that the foregoing Agreement between you and Employer will not apply to an invention that you developed entirely on your own time without using Employer equipment, supplies, facilities, or trade secret information, except for those inventions that either:

(1) Relate to Employer's business, or actual or demonstrably anticipated research or development; or

(2) Result from any work performed by you on behalf of Employer.

To the extent a provision in the foregoing Agreement purports to require you to assign an invention otherwise excluded from the preceding paragraph, the provision is against the public policy of this state and is void and unenforceable.

A-2

## For North Carolina Employees Only

**THIS IS TO NOTIFY** you in accordance with North Carolina General Statute §§ 66.57.1 and 66.57.2 that the foregoing Agreement between you and Employer does not require you to assign or offer to assign to Employer any invention that you developed entirely on your own time without using Employer's equipment, supplies, facilities or trade secret information except for those inventions that either:

(1) Relate at the time of conception or reduction to practice of the invention to Employer's business, or actual or demonstrably anticipated research or development of Employer; or

(2) Result from any work performed by you for Employer.

To the extent a provision in the foregoing Agreement purports to require you to assign an invention otherwise excluded from the preceding paragraph, the provision is against the public policy of this state and is void and unenforceable. You will have the burden of establishing that any invention is excluded from assignment to Employer by the preceding paragraph.

This limited exclusion does not apply to any patent or invention covered by a contract between Employer and the United States or any of its agencies requiring full title to such patent or invention to be in the United States.

## For Utah Employees Only

**THIS IS TO NOTIFY** you in accordance with Utah Code §§ 34-39-1 to 34-39-3 that the foregoing Agreement between you and Company will not apply to an invention that is both (i) created by you on your own time, and (ii) not an "employment invention."

An "employment invention" means an invention or any part that is:
- Conceived, developed, or reduced to practice or created by you:
    - within the scope of your employment;
    - on Employer's time; or
    - with the aid, assistance, or use of any of Employer's property, equipment, facilities, supplies, resources, or intellectual property.
- The result of any work, services, or duties performed by you for Employer.
- Related to Employer's industry or trade.
- Related to Employer's current or demonstrably anticipated business, research, or development .

To the extent a provision in the foregoing Agreement purports to require you to assign an invention otherwise excluded from the preceding paragraph, the provision is against the public policy of this state and is void and unenforceable.

## For Washington Employees Only

**THIS IS TO NOTIFY** you in accordance with Section 49.44.140 of the Revised Codes of Washington that the foregoing Agreement between you and Employer does not apply to an invention for which no equipment, supplies, facilities, or trade secret information of Employer was used, and which was developed entirely on your own time, unless:

(1) The invention relates (a) directly to the business of Employer, or (b) to Employer's actual or demonstrably anticipated research or development; or

(2) The invention results from any work performed by you for Employer.

A-3

To the extent a provision in the foregoing Agreement purports to require you to assign an invention otherwise excluded from the preceding paragraph, the provision is against the public policy of this state and is void and unenforceable.

## EXHIBIT B

### JURISDICTION-SPECIFIC MODIFICATIONS TO SECTION 4
### (AS APPLICABLE)

### For District of Columbia Employees Only

Section 4 of this Agreement will be replaced in its entirety with the following:

During my employment by Company, I will not, without Company's written consent, directly or indirectly engage in any outside employment or business activity that Company reasonably believes will: (i) result in my disclosure or use of Company's Confidential Information; (ii) conflict with Company's, industry's or my profession's rules regarding conflicts of interest; (iii) constitute a conflict of commitment (if I am employed by a higher education institution); or (iv) impair Company's ability to comply with any District or federal laws or regulations, contract, or grant agreement.

## EXHIBIT C

## JURISDICTION-SPECIFIC NON-SOLICITATION MODIFICATIONS TO SECTION 5
(AS APPLICABLE)

### For Alabama Employees Only

I acknowledge that I agree to this Section 5 in order to protect Company's protectable business interests pursuant to Ala. Code §§ 8-1-190 to 8-1-197. I acknowledge that during my employment I will have access to and knowledge of Confidential Information and such Confidential Information contains trade secrets pursuant to Ala. Code § 8-27-2.

### For Arizona Employees Only

I acknowledge that, for purposes of Section 5 of the Agreement, references to "*Potential Customer*" will not apply to me.

### For Arkansas Employees Only

I acknowledge that I agree to this Section 5 in order to protect Company's legitimate business interests pursuant to Section 4-75-101 of the Arkansas Code.

### For California Employees Only

I acknowledge that Sections 5.2-5.6 of this Agreement will not apply to me.

### For Colorado Employees Only

I acknowledge that Section 5 of this Agreement will not apply to me.

### For Florida Employees Only

I acknowledge that I agree to this Section 5 in order to protect Company's legitimate business interests pursuant to Fla. Stat. Section 542.335.

### For Georgia Employees Only

I acknowledge that, for purposes of Section 5 of the Agreement, references to "*Potential Customer*" will not apply to me.

### For Hawaii Employees Only

I acknowledge that Section 5 of this Agreement will not apply to me if I am employed by a "technology business" as defined by Haw. Rev. Stat. 480-4.

### For Indiana Employees Only

I acknowledge that, for purposes of Section 5 of the Agreement, references to "*Potential Customer*" will not apply to me.

C-1

## For Illinois Employees Only

I acknowledge and understand that Section 5 of the Agreement shall apply to me only if my actual or expected annualized rate of earnings exceeds the applicable earnings threshold under the Illinois Freedom to Work Act (820 ILSC 90/10).

I acknowledge that, for purposes of the Agreement, references to "*Customer or Potential Customer*" shall mean any person or entity who or which, at any time during the one year period prior to my contact with such person or entity as described in Sections 5.5 or 5.6 if such contact occurs during my employment or, if such contact occurs following the termination of my employment, during the one year period prior to the date my employment with Company ends: (i) contracted for, was billed for, or received from Company any product, service or process with which I worked directly or indirectly during my employment by Company or about which I acquired Confidential Information; or (ii) was in contact with me or in contact with any other employee, owner, or agent of Company, of which contact I was or should have been aware, concerning the sale or purchase of, or contract for, any product, service or process with which I worked directly or indirectly during my employment with Company or about which I acquired Confidential Information; or (iii) was solicited by Company in an effort in which I was involved or of which I was aware.

## For Louisiana Employees Only

I acknowledge that I agree to this Section 5 in order to protect Company's legitimate business interests pursuant to La. R.S. 23:921.

I acknowledge that for purposes of Section 5 of the Agreement, references to "*Potential Customer*" will not apply to me. In addition, Section 5 of the Agreement will only apply to areas within the Ascension, East Baton Rouge, East Feliciana, Iberville Jefferson, Livingston, Orleans, Plaquemines, Pointe Coupee, St. Bernard, St. Tammany, St. Charles, St. Helena, St. John the Baptist, St. James, West Baton Rouge, and West Feliciana parishes of Louisiana, which I acknowledge and agree are the parishes where I conduct business for Company in Louisiana.

## For Minnesota Employees Only

I acknowledge that, for purposes of Section 5 of the Agreement, references to "*Potential Customer*" will not apply to me.

## For Missouri Employees Only

I acknowledge that, for purposes of Section 5 of the Agreement, references to "*Potential Customer*" will not apply to me. I further acknowledge that Section 5 of the Agreement will not apply to me if I am an employee who provides only secretarial or clerical services.

## For New Hampshire Employees Only

I acknowledge that, for purposes of Section 5 of the Agreement, references to "*Potential Customer*" will not apply to me.

## For North Dakota Employees Only

I acknowledge that Section 5 of the Agreement will not apply to me.

## For South Dakota Employees Only

I acknowledge that, for purposes of Section 5 of the Agreement, references to "*Potential Customer*" will not apply to me.

**For Oklahoma Employees Only**

I acknowledge that, for purposes of Section 5 of the Agreement, references to "*Potential Customer*" will not apply to me.

**For Oregon Employees Only**

I acknowledge that, for purposes of Section 5 of the Agreement, references to "*Potential Customer*" will not apply to me.

**For Tennessee Employees Only**

I acknowledge that, for purposes of Section 5 of the Agreement, references to "*Potential Customer*" will not apply to me.

**For Virginia Employees Only**

I acknowledge that Section 5 of this Agreement will be replaced in its entirety with the following:

5.    I agree that during the period of my employment and for the one-year period after the date my employment ends for any reason, including but voluntary termination by me or involuntary termination by Company, I will not, as an officer, director, employee, consultant, owner, partner, or in any other capacity, either directly or through others, except on behalf of Company:

   5.1    solicit, induce, encourage, or participate in soliciting, inducing or encouraging any person known to me to be an employee, consultant, or independent contractor of Company to terminate his or her relationship with Company, even if I did not initiate the discussion or seek out the contact;

   5.2    solicit, induce, encourage, or participate in soliciting, inducing, or encouraging any person known to me to be an employee, consultant, or independent contractor of Company to terminate his or her relationship with Company to render services to me or any other person or entity that researches, develops, markets, sells, performs or provides or is preparing to develop, market, sell, perform or provide Conflicting Services (as defined below);

   5.3    hire, employ, or engage in a business venture with as partners or owners or other joint capacity, or attempt to hire, employ, or engage in a business venture as partners or owners or other joint capacity, with any person then employed by Company or who has left the employment of Company within the preceding three months to research, develop, market, sell, perform or provide Conflicting Services;

   5.4    solicit, induce or attempt to induce any Customer or Potential Customer (as defined below), to terminate, diminish, or materially alter in a manner harmful to Company its relationship with Company;

   5.5    solicit or assist in the solicitation of any Customer or Potential Customer to induce or attempt to induce such Customer or Potential Customer to  purchase or contract for any Conflicting Services; or

   5.6    perform, provide or attempt to perform or provide any Conflicting Services for a Customer or Potential Customer.

The parties agree that for purposes of this Agreement, a "*Customer or Potential Customer*" is any person or entity who or which, at any time during the one-year period before my contact with such person or entity as described in Sections 5.4-5.6 above if such contact occurs during my employment or, if such contact occurs after the termination of my employment, during the one-year period before the date my employment with Company ends: (i) contracted for, was billed for, or received from Company any product, service or process with which I worked directly or indirectly during my employment by Company or about which I acquired Confidential Information; or (ii) was in contact with me or in contact with any other employee, owner, or agent of Company, of which contact I was or should have been aware, concerning the sale or purchase of, or contract for, any product, service or process with which I worked directly or indirectly during my employment with Company or about which I acquired Confidential Information; or (iii) was solicited by Company in an effort in which I was involved or of which I was aware.

C-3

The parties agree that for purposes of this Agreement, *"Conflicting Services"* means any product, service, or process or the research and development thereof, of any person or organization other than Company that directly competes with a product, service, or process, including the research and development thereof, of Company with which I worked directly or indirectly during my employment by Company or about which I acquired Confidential Information during my employment by Company.

## For Wisconsin Employees Only

I acknowledge that, for purposes of Section 5 of the Agreement, references to "*Potential Customer*" will not apply to me.

C-4

## EXHIBIT D

### JURISDICTION-SPECIFIC NON-COMPETITION MODIFICATIONS TO SECTION 6
### (AS APPLICABLE)

#### For Alabama Employees Only

I acknowledge that I agree to this Section 6 in order to protect Company's protectable business interests pursuant to Ala. Code §§ 8-1-190 to 8-1-197. I acknowledge that during my employment I will have access to and knowledge of Confidential Information and such Confidential Information contains trade secrets pursuant to Ala. Code § 8-27-2.

#### For Arkansas Employees Only

I acknowledge that I agree to this Section 6 in order to protect Company's legitimate business interests pursuant to Section 4-75-101 of the Arkansas Code.

#### For California Employees Only

I acknowledge that Section 6 of this Agreement will not apply to me.

#### For Colorado Employees Only

I acknowledge that Section 6 of this Agreement will not apply to me.

#### For District of Columbia Employees Only

I acknowledge and understand that Section 6 shall apply to me only if my annualized compensation (including, but not limited to salary, commissions, and bonuses) meets or exceeds the greater of (i) $150,000; or (ii) the compensation threshold as adjusted pursuant to D.C. Code §32-581.01 (the "Washington D.C. Compensation Threshold"). If my annualized compensation meets or exceeds the Washington D.C. Compensation Threshold, I acknowledge that I received notice of the restrictions in Section 6, including the following notice below, pursuant to D.C. Code §32-581.01:

#### NOTICE PURSUANT TO D.C. CODE § 32-581.01

The District's Ban on Non-Compete Agreements Amendment Act of 2020 limits the use of non-compete agreements. It allows employers to request non-compete agreements from highly compensated employees, as that term is defined in the Ban on Non-Compete Agreements Amendment Act of 2020, under certain conditions. Mini Studio Inc. has determined that you are a highly compensated employee. For more information about the Ban on Non-Compete Agreements Amendment Act of 2020, contact the District of Columbia Department of Employment Services (DOES).

#### For Florida Employees Only

I acknowledge that I agree to this Section 6 in order to protect Company's legitimate business interests pursuant to Fla. Stat. Section 542.335.

**For Georgia Employees Only**

I acknowledge that Section 6 of this Agreement will not apply to me if I do not (i) customarily and regularly solicit for Company's customers or prospective customers; (ii) customarily and regularly engage in making sales or obtaining orders or contracts for products or services; (iii) perform the following duties: have a primary duty of managing the enterprise in which I am employed or of a customarily recognized department or subdivision, customarily and regularly direct the work of two or more other employees, and have the authority to hire or fire other employees or have particular weight given to suggestions and recommendations as to the hiring, firing, advancement, promotion, or any other change of status of other employees; or (iv) perform the duties of a key employee or professional, pursuant to O.C.G.A. § 13-8-53(a).

**For Hawaii Employees Only**

I acknowledge that Section 6 of this Agreement will not apply to me if I am employed by a "technology business" as defined by Haw. Rev. Stat. 480-4. I acknowledge that I agree to this Section 6 in order to protect Company's legitimate business interests pursuant to Section 480-4 of the Hawaii Revised Statutes.

**For Idaho Employees Only**

I acknowledge that this Section 6 protects Company's legitimate business interests, including its interests in Company's trade secrets and Confidential Information, its substantial and near permanent relationships with customers, and its customer goodwill.

I acknowledge that Section 6 of this Agreement will not apply to me if I am not a "key" employee or "key" independent contractor, as defined under Idaho Code § 44-2702(1).

**For Illinois Employees Only**

I acknowledge that this Section 6 protects Company's legitimate business interests, including its interests in Company's trade secrets and Confidential Information, its substantial and near permanent relationships with customers, and its customer goodwill.

I acknowledge and understand that Section 6 of the Agreement shall apply to me only if my actual or expected annualized rate of earnings exceeds the applicable earnings threshold under the Illinois Freedom to Work Act (820 ILSC 90/10).

**For Indiana Employees Only**

I acknowledge that this Section 6 protects Company's legitimate business interests, including its interests in Company's trade secrets and Confidential Information, its substantial and near permanent relationships with customers, and its customer goodwill.

**For Louisiana Employees Only**

I acknowledge that I agree to this Section 6 in order to protect Company's legitimate business interests pursuant to La. R.S. 23:921.

I acknowledge that, for purposes of Section 6 of the Agreement, references to "*Restricted Territory*" will only apply to areas within the Ascension, East Baton Rouge, East Feliciana, Iberville Jefferson, Livingston, Orleans, Plaquemines, Pointe Coupee, St. Bernard, St. Tammany, St. Charles, St. Helena, St. John the Baptist, St. James, West Baton Rouge, and West Feliciana parishes of Louisiana, which I acknowledge and agree are the parishes where I conduct business for Company in the State of Louisiana.

D-2

## For Maine Employees Only

I acknowledge  that, pursuant to 26 M.R.S.A. § 599-A, Section 6 of this Agreement will not apply to me if (i) I earn wages at or below 400% of the federal poverty level, or (ii) if Company did not provide notice to me of a non-compete requirement and did not provide a copy of this Agreement at least three business days before Company required the Agreement to be signed.

## For Maryland Employees Only

I acknowledge that Section 6 of this Agreement will not apply to me if I earn less than either (i) $15.00 per hour, or (ii) $31,200 per year, pursuant to Md. Code Ann., Lab. & Empl. § 3-716(a).

## For Massachusetts Employees Only

I acknowledge that the Company may elect to enforce the provisions of Section 6 or waive them at its sole discretion.  If Company elects to waive the provisions of Section 6, such waiver may be accomplished by Company providing me with written notice of its election to waive: (A) on or before the last day of my employment with Company pursuant to an involuntary termination by Company for Cause, or (B) within two weeks after Company's receipt of written notice from me of my resignation from employment. If Company does not elect to waive the provisions of this Section 6 then Company must either: (i) accelerate the vesting of my Company stock options by 3 months ("*Mutually Agreed Upon Consideration*"), or, in the event I do not have any Company stock options, (ii) pay me continuing salary payments for one year following termination of my employment at a rate equal to no less than 50% of the highest annualized base salary paid to me by Company within the two years prior to the termination of my relationship with Company ("*Garden Leave Payments*"). Notwithstanding anything to the contrary above, Company may enforce the covenants in this Section 6 without providing the Garden Leave Payments, if applicable, if it determines in good faith that I breached this Section 6 or unlawfully misappropriated Company's physical or electronic property.  For avoidance of doubt, Company's failure to timely waive the provisions of Section 6 shall be construed as its election to enforce the provisions of this Section 6.  For further avoidance of doubt, if Company elects to waive, I am classified as nonexempt under the Fair Labor Standards Act, 29 U.S.C. 201-219, or Company is otherwise prohibited by law or a court from enforcing, the provisions of this Section 6, I will not be subject to the restrictions in this Section 6 nor will I be entitled to any Mutually Agreed Upon Consideration or Garden Leave Payments.

I agree that for purposes of this Agreement, "*Cause*" shall mean a termination of my employment by the Company due to my misconduct or failure to meet the Company's performance expectations

I agree that for purposes of this Agreement, "*Restricted Territory*" means the geographic areas in which I provided services for Company or had a material presence or influence, during any time within the last two years prior to the termination of my relationship with Company.

## For Michigan Employees Only

I acknowledge that this Section 6 protects Company's legitimate business interests, including its interests in Company's trade secrets and Confidential Information, its unique business relationships, and its customer goodwill. I acknowledge that Section 6 is necessary to protect these legitimate business interests.

## For Minnesota Employees Only

I acknowledge that this Section 6 protects Company's legitimate business interests, including its interests in Company's trade secrets and Confidential Information, its former clients or customers, and its customer goodwill.

D-3

### For Missouri Employees Only

I acknowledge that I agree to this Section 6 in order to protect Company's legitimate business interests pursuant to Section 416.031 of the Missouri Revised Statutes. I acknowledge that this Section 6 is necessary to protect those legitimate business interests.

I acknowledge that Section 6 of this Agreement will not apply to me if I am an employee who provides only clerical or secretarial services.

### For Montana Employees Only

I acknowledge that Section 6 of the Agreement is reasonably necessary to protect Company's legitimate business interests in good will, customer relationships, and trade information pursuant to Mont. Code Ann. §§ 28-2-703 to 28-2-705.

I acknowledge that Section 6 of the Agreement does not operate as an absolute or full restraint on my right to work.

I acknowledge that Section 6 of the Agreement will not apply to me if I am terminated by Company.

### For New Hampshire Employees Only

I acknowledge that, pursuant to N.H. RSA § 275:70, that this Section of this Agreement will not apply to me after the termination of my employment, unless (i) Company provided me a copy of this Agreement before I accepted my offer of employment, if this was a condition of employment before my employment with Company, and (ii) I earn an hourly wage of more than 200% of the federal minimum wage.

### For North Dakota Employees Only

I acknowledge that Section 6 of this Agreement will not apply to me.

### For Ohio Employees Only

I acknowledge that this Section 6 protects Company's legitimate business interests, including its interests in Company's trade secrets and Confidential Information and its customer goodwill. I acknowledge that Section 6 is necessary to protect these legitimate business interests.

### For Oklahoma Employees Only

I acknowledge that Section 6 of this Agreement will not apply to me.

### For Oregon Employees Only

I acknowledge that either (a) Company informed me in a written employment offer received by me at least two weeks before my first day of work that a noncompetition agreement is required as a condition of employment or (b) this noncompetition agreement is entered into upon my subsequent bona fide advancement by Company. I understand Company reserves all of the options under ORS 653.295 for enforcement of this noncompetition agreement for up to one year.

I acknowledge that this Section 6 of the Agreement will not apply to me if I am classified as a nonexempt employee under the federal Fair Labor Standards Act.

I acknowledge that this Section 6 of the Agreement will only apply to me if the total amount of my annual gross salary and commissions, calculated on an annual basis, at the time of my termination, exceeds the median family income for a four-person family, as determined by the U.S. Census Bureau for the most recent year available at the time of my termination. I acknowledge that this Section 6 of the Agreement will only apply to me if my salary is at least $100,533.00 in 2021 dollars adjusted for inflation.

D-4

**For Rhode Island Employees Only**

I acknowledge that this Section 6 of this Agreement will not apply to me if I am (i) classified as a nonexempt employee under the federal Fair Labor Standards Act; (ii) an undergraduate or graduate student participating in an internship or otherwise entering into a short-term employment relationship with Company while enrolled at an educational institution; (iii) under the age of 18; or (iv) an employee who earns less than 250% of the federal poverty level for individuals as established by the United States Department of Health and Human Services federal poverty guidelines.

**For South Dakota Employees Only**

I acknowledge that I agree to this Section 6 in order to protect Company's legitimate business interests pursuant to SDCL 53-9-8 through SDCL 53-9-11.

**For Utah Employees Only**

I acknowledge that I agree to this Section 6 in order to protect Company's legitimate business interests pursuant to Utah Code §§ 34-51-101 to 34-51-301.

**For Virginia Employees Only**

I acknowledge that Section 6 of this Agreement will be replaced in its entirety with the following:

I agree that for the one-year period after the date my employment ends for any reason, including voluntary termination by me or involuntary termination by Company, I will not, directly or indirectly, as an officer, director, employee, consultant, owner, partner, or in any other capacity solicit, perform, or provide, or attempt to perform or provide Conflicting Services anywhere in the Restricted Territory (as defined below), nor will I assist another person to solicit, perform or provide or attempt to perform or provide Conflicting Services anywhere in the Restricted Territory**.**

The parties agree that for purposes of this Agreement, "***Restricted Territory***" means the 100-mile radius of any of the following locations: (i) any Company business location at which I have worked on a regular or occasional basis during the preceding year; (ii) my home if I work from home on a regular or occasional basis; (iii) any potential business location of Company under active consideration by Company to which I have traveled in connection with the consideration of that location; (iv) the primary business location of a Customer or Potential Customer; or (v) any business location of a Customer or Potential Customer where representatives of the Customer or Potential Customer with whom I have been in contact in the preceding year are based.

I acknowledge that this Section 6 of this Agreement will not apply to me if my average weekly earnings, as determined pursuant to Code of Virginia §40.1-28.7:7, are less than the average weekly wage of the Commonwealth as determined by Va. Code Ann. § 65.2-500(B).

**For Washington Employees Only**

I acknowledge that Section 6 of this Agreement will only apply to me after the termination of my employment for any reason if my total annualized compensation (such as salary, commissions and bonuses), calculated as of the earlier of my employment separation date or the date Company seeks to enforce the restrictions in Section 6, meets or exceeds the greater of (i) $107,301.04; or (ii) the compensation threshold established by the Washington State Department of Labor and Industries (collectively, the "***Compensation Threshold***").

I acknowledge that in the event that my employment is terminated as the result of a layoff, Company may elect to enforce the provisions of Section 6 of this Agreement or waive them at its sole discretion.  If Company elects to waive the provisions of Section 6, such waiver may be accomplished by Company providing me with written notice of its election to waive on or before the last day of my employment with Company pursuant to an involuntary termination by Company as part of the layoff. If Company does not elect to waive the provisions of this Section 6 in connection with a reduction in force only, then

Company must pay me continuing salary payments for the remainder of the term specified in Section 6 after termination of my employment at a rate equal to no less than my base salary at the time of the termination of my employment, less any compensation earned through my subsequent employment ("*Garden Leave Payments*").  Notwithstanding anything to the contrary above, Company may enforce the covenants in Section 6 without providing the Garden Leave Payments, if applicable, if it determines in good faith that I breached Section 6 or unlawfully misappropriated Company's physical or electronic property.  I agree that upon a request from Company, I will provide Company with proof of my new wage rate or salary through subsequent employment for the purposes of calculating Garden Leave Payments, which may be adjusted from payment to payment based on the information I provide to Company. For further avoidance of doubt, if my annualized compensation does not meet or exceed the Compensation Threshold (as defined in this **Exhibit D**), I will not be subject to the restrictions in Section 6.

## For Wisconsin Employees Only

I acknowledge that this Section 6 protects Company's legitimate business interests, including its interests in Company's trade secrets and Confidential Information, relationships with customers or recent past customers, and its customer goodwill. I acknowledge that Section 6 is reasonably necessary to protect these legitimate business interests as defined by Wis. Stat. § 103.465.

I further acknowledge that Section 6 of the Agreement will only apply to Conflicting Services related to my particular division or product line at Company. Pursuant to Wis. Stat. § 103.465, Section 6 of the Agreement does not prohibit me from engaging in activities that are not in direct competition with Company.

# EXHIBIT 2

# Copyright

---

**Registration Number / Date:**
VAU001569706 / 2026-01-13

**Type of Work:**
Visual Material

**Title:**
PURP ? Character Model Sheet.

**Application Title:**
PURP ? Character Model Sheet.

**Date of Creation:**
2024

**Copyright Claimant:**
Mini Studio, Inc. Address: One World Trade Center, 85th Floor, c/o Servcorp, New York, NY, 10007, United States.

**Authorship on Application:**
Mini Studio, Inc., Domicile: United States. employer for hire; Authorship: 2-D artwork.

**Rights and Permissions:**
Mini Studio, Inc., One World Trade Center, 85th Floor, c/o Servcorp, New York, NY, 10007, United States

**Description:**
Electronic file (eService)

**Copyright Note:**
C.O. correspondence.
Regarding basis for registration: Registration based on deposited pictorial authorship describing, depicting, or embodying character(s). Compendium 313.4(H).

**Names:**
Mini Studio, Inc.

**USCO Catalog Link:**
https://publicrecords.copyright.gov/detailed-record/siebel_VAu001569706

---

Disclaimer: This material was generated by the U.S. Copyright Office's Copyright Public Records System (CPRS). For certified records, contact the Records Research and Certification Division. For information on searching copyright records, see How to Investigate the Copyright Status of a Work (Circular 22). For information on removing personal information from Copyright Office public records, refer to Privacy: Public Copyright Registration Records(Circular 18).

# EXHIBIT 3

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

MINI STUDIO, INC.,

      Plaintiff,

v.

KEVIN WANSA a/k/a KEVIN VAN WITT,
AND THE MONSTER LIBRARY,

      Defendants.

    CIVIL ACTION
    NO.

    JANUARY 21, 2026

## COMPLAINT FOR COPYRIGHT
## INFRINGEMENT AND INJUNCTIVE RELIEF

Plaintiff Mini Studio, Inc. ("**Mini Studio**" or "**Plaintiff**"), by and through

undersigned counsel, alleges as follows:

### Nature of the Action

1.    This is an action for copyright infringement under the Copyright Act, 17

U.S.C. §§ 101 et seq., arising from Defendants' unauthorized copying, use, and

exploitation of Mini Studio's copyrighted character artwork from the FUZZLETS

universe, including Mini Studio's character "PURP."

2.    Defendants have created, published, and distributed audiovisual content

that copies protectable expression embodied in Mini Studio's copyrighted character

artwork and constitutes an unauthorized and infringing derivative work.

3.    Defendants' infringing audiovisual work includes, without limitation, the

YouTube video titled "Remi & The Lighthouse: The Storm That Changed Everything"

available at the following URL: https://www.youtube.com/watch?v=-4H46BKw3ow (the

"Infringing Video").

4.     Mini Studio seeks injunctive relief to restrain Defendants' ongoing infringement, as well as damages, attorneys' fees, and such other relief as the Court deems just and proper.

## Parties

5.     Plaintiff Mini Studio, Inc. is a Delaware corporation with its principal place of business at One World Trade Center, 85th Floor, c/o Servcorp, New York, NY 10007.

6.     Defendant Kevin Wansa is an individual residing at 5 Short Street, Westport, CT 06880.  Defendant has also held himself out publicly under the name "Kevin Van Witt."

7.     Defendant The Monster Library is, upon information and belief, an unincorporated business, brand, and/or alter ego operated by Defendant Wansa and used to publish and monetize audiovisual content online, including on YouTube.

8.     At all relevant times, Defendants acted individually and/or in concert and are responsible for the acts alleged herein.

## Jurisdiction and Venue

9.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a) because this action arises under the Copyright Act, 17 U.S.C. §§ 101 et seq.

10.     Venue is proper in this District pursuant to 28 U.S.C. § 1400(a) and 28 U.S.C. § 1391 because Defendant Wansa resides in this District and may be found in this District.

11.    This Court has personal jurisdiction over Defendants because Defendant Wansa resides in Connecticut and engaged in the infringing conduct complained of herein from Connecticut, including the publication and distribution of the Infringing Video.

### Mini Studio's Copyrighted Work

12.    Mini Studio is the owner of copyright in the character artwork titled "PURP — Character Model Sheet" (the "**PURP Work**"), which depicts and embodies the protectable expression of the PURP character, including its distinctive silhouette and proportions, facial feature configuration, fur and texture presentation, color treatment, and the design and placement of the character's winter hat.

13.    The PURP Work is registered with the United States Copyright Office under Registration No. VAu001569706, with an effective date of registration of January 13, 2026.

14.    Mini Studio is the author and owner of the PURP Work, which was created as a work made for hire by Mini Studio employees acting within the scope of their employment for Mini Studio.

15.    Mini Studio has continuously owned the rights in the PURP Work since its creation.

### Defendants' Infringing Conduct

16.    Defendants created, published, distributed, and publicly displayed the Infringing Video, which contains a character and related expressive elements that are substantially similar to, and unlawfully derived from, Mini Studio's copyrighted PURP Work.

17. The infringement is not limited to general ideas such as "cute creatures," "children's stories," "forest settings," or "wellness themes." Rather, Defendants' character reproduces protected, concrete expressive choices embodied in Mini Studio's copyrighted character artwork, including the specific combination of the character's proportions and silhouette, facial configuration, color treatment, fur and texture presentation, and the winter hat design and placement.

18. The PURP character and Mini Studio's FUZZLETS universe were developed and publicly disseminated by Mini Studio prior to Defendants' publication of the Infringing Video.

19. Upon information and belief, Defendant Wansa was employed by Mini Studio as a full-time employee beginning in or around January 2023, during which time he signed an Employee Confidential Information and Inventions Assignment Agreement and an equity plan agreement that imposed confidentiality, non-competition, and intellectual property assignment obligations in favor of Mini Studio. In that role, he had access to Mini Studio's FUZZLETS character design materials, internal development files, and workflow resources, including materials relating to PURP, and he used Mini Studio equipment and accounts in connection with those duties.

20. Defendants' conduct has caused and continues to cause Mini Studio irreparable harm, including harm to Mini Studio's intellectual property, brand, and market for licensing and distribution opportunities.

## Pre-Suit Notice and Misconduct

21.    On February 16, 2024, Mini Studio's outside counsel at Cooley LLP sent Defendant Wansa a written cease-and-desist letter (the "2024 Cease-and-Desist Letter"). The 2024 Cease-and-Desist Letter advised Wansa that Mini Studio had discovered he was unlawfully using and disclosing Mini Studio's confidential information and trade secrets for the benefit of a competing venture branded as "The Monster Library" while still employed by Mini Studio, in violation of his Employee Confidential Information and Inventions Assignment Agreement and his duty of loyalty. The letter notified Wansa that his employment was being terminated for cause, demanded that he cease all work with Monster Library and any other competitor, demanded the prompt return of all company equipment and confidential materials, and put him on notice that Mini Studio would pursue legal action, including injunctive relief, if he did not comply.

22.    Despite receiving the 2024 Cease-and-Desist Letter and being expressly instructed to cease all work with Monster Library and to stop using Mini Studio's confidential information, Defendants continued to operate The Monster Library and to exploit a character that is substantially similar to Mini Studio's PURP character, including by publishing and maintaining the Infringing Video. Defendants' infringement is therefore knowing and willful.

## YouTube DMCA Takedown and Counter-Notification

23.    On or about January 2, 2026, Mini Studio submitted a copyright takedown notice to YouTube under 17 U.S.C. § 512 regarding the Infringing Video. In response, YouTube removed or disabled access to the Infringing Video.

24.     On January 9, 2026, YouTube notified Mini Studio that Defendant Wansa had submitted a counter-notification under 17 U.S.C. § 512(g) contesting the takedown. In that counter-notification, Wansa asserted under penalty of perjury that the removal of the Infringing Video was the result of a mistake or misidentification, claimed that he independently created the video and that it does not copy any copyrighted work owned by Mini Studio, and consented to the jurisdiction of this Court. YouTube's notice stated that, absent evidence of a filed lawsuit seeking to restrain the alleged infringement, YouTube may reinstate the Infringing Video after ten (10) business days.

25.     This action is filed within that statutory window and seeks, among other relief, an order restraining Defendants' continued infringement, including distribution of the Infringing Video at https://www.youtube.com/watch?v=-4H46BKw3ow.

## Irreparable Harm and Need for Injunction

26.     Defendants' infringement is ongoing and threatens continued harm to Mini Studio's exclusive rights, including rights to prepare derivative works and to control the marketplace for the PURP character and the FUZZLETS universe.

27.     Mini Studio lacks an adequate remedy at law because unauthorized online distribution causes immediate and difficult-to-quantify harms, including loss of control, dilution of distinctiveness, and impairment of licensing value.

28.     Unless restrained by this Court, Defendants will continue to infringe Mini Studio's copyrighted work.

## CLAIM FOR RELIEF

### COUNT I — COPYRIGHT INFRINGEMENT (17 U.S.C. § 501)

29.     Plaintiff repeats and realleges the allegations in paragraphs 1 through 28 as if fully set forth herein.

30.     Mini Studio owns valid copyrights in the PURP Work, including Registration No. VAu001569706.

31.     Defendants, without authorization, copied protected expression embodied in the PURP Work and created and distributed an infringing and/or derivative audiovisual work, including the Infringing Video located at https://www.youtube.com/watch?v=-4H46BKw3ow.

32.     Defendants have infringed Mini Studio's copyrights in violation of 17 U.S.C. § 501, including Mini Studio's exclusive rights under 17 U.S.C. § 106.

33.     As a result of Defendants' infringement, Mini Studio has suffered and will continue to suffer damages in an amount to be proven at trial.

34.     Defendants' infringement was willful, intentional, and undertaken with knowledge of Mini Studio's rights, including after receipt of the 2024 Cease-and-Desist Letter described above.

### PRAYER FOR RELIEF

WHEREFORE, Mini Studio respectfully requests that the Court enter judgment in its favor and against Defendants as follows:

A.      Declaring that Defendants have infringed Mini Studio's copyrights in the PURP Work;

B.      Entering preliminary and permanent injunctive relief restraining Defendants, and all those acting in concert with them, from copying, distributing, displaying, exploiting, or creating derivative works based on the PURP Work and the PURP character expression embodied therein, including continued distribution of the Infringing Video at https://www.youtube.com/watch?v=-4H46BKw3ow;

C.      Ordering Defendants to remove, disable access to, and/or cease distribution of infringing materials within their control;

D.      Awarding Mini Studio damages pursuant to 17 U.S.C. §§ 504 and 505, including statutory damages to the extent available, and attorneys' fees and costs; and

E.      Awarding such other and further relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all issues triable as such.

PLAINTIFF – MINI STUDIO, INC.

By: _____
    Andy I. Corea – ct25925
    acorea@harrisbeachmurtha.com

HARRIS BEACH MURTHA CULLINA PLLC
265 Church Street, 9th Floor
New Haven, CT 06510
Telephone:  203.772.7700
Facsimile:   203.772.7723
Its Attorneys

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Mini Studio, Inc.

**(b)** County of Residence of First Listed Plaintiff   New York
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Andy I. Corea (ct25925)
HARRIS BEACH MURTHA CULLINA PLLC
265 Church Street, 9th Floor, New Haven, CT 06510
Telephone:  203-772-7700

## DEFENDANTS
Kevin Wansa a/k/a Kevin Van Witt, and The Monster Library

County of Residence of First Listed Defendant   Fairfield
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1 U.S. Government
Plaintiff

☒ 3 Federal Question
*(U.S. Government Not a Party)*

☐ 2 U.S. Government
Defendant

☐ 4 Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ | | **INTELLECTUAL** | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' | Product Liability | | ☒ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | Liability | ☐ 368 Asbestos Personal Injury Product | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 340 Marine | Liability | | ☐ 835 Patent – Abbreviated New Drug Application | ☐ 460 Deportation |
| | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | **LABOR** | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | ☐ 360 Other Personal | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | **SOCIAL SECURITY** | |
| ☐ 195 Contract Product Liability | Injury | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | ☐ 362 Personal Injury - Medical Malpractice | | ☐ 751 Family and Medical Leave Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| | | | | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 448 Education | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*
☒ 1 Original
Proceeding

☐ 2 Removed from
State Court

☐ 3 Remanded from
Appellate Court

☐ 4 Reinstated or
Reopened

☐ 5 Transferred from
Another District
*(specify)*

☐ 6 Multidistrict
Litigation -
Transfer

☐ 8 Multidistrict
Litigation -
Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
17 U.S.C. §§ 101 et seq.
Brief description of cause:
Claim for copyright infringement

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A **CLASS ACTION**
UNDER RULE 23, F.R.Cv.P.

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:**  ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*   JUDGE _____   DOCKET NUMBER _____

DATE
1/21/26

SIGNATURE OF ATTORNEY OF RECORD
Andy Corea -

FOR OFFICE USE ONLY

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

JS 44 Reverse (Rev. 03/24)

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)** **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

  **(b)** **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

  **(c)** **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.** **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.** **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.** **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C, Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation - Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation - Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

**VI.** **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.** **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** **Related Cases.** This section of the JS 44 is used to reference related cases, if any. If there are related cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

## Exhibit A

**Copyright registration (PURP — Character Model Sheet, VAu001569706)**

# Copyright

**Registration Number / Date:**
VAU001569706 / 2026-01-13

**Type of Work:**
Visual Material

**Title:**
PURP ? Character Model Sheet.

**Application Title:**
PURP ? Character Model Sheet.

**Date of Creation:**
2024

**Copyright Claimant:**
Mini Studio, Inc. Address: One World Trade Center, 85th Floor, c/o Servcorp, New York, NY, 10007, United States.

**Authorship on Application:**
Mini Studio, Inc., Domicile: United States. employer for hire; Authorship: 2-D artwork.

**Rights and Permissions:**
Mini Studio, Inc., One World Trade Center, 85th Floor, c/o Servcorp, New York, NY, 10007, United States

**Description:**
Electronic file (eService)

**Copyright Note:**
C.O. correspondence.
Regarding basis for registration: Registration based on deposited pictorial authorship describing, depicting, or embodying character(s). Compendium 313.4(H).

**Names:**
Mini Studio, Inc.

**USCO Catalog Link:**
https://publicrecords.copyright.gov/detailed-record/
siebel_VAu001569706

**Exhibit B**

**A short side-by-side comparison PDF with a few still frames (Mini Studio vs Monster Library), with timestamps**

www.themonsterlibrary.com Image taken on Sunday, January 18, 2026. Video unavailable due to DMCA takedown by Mini Studio, Inc. Originally published at: https://youtu.be/-4H46BKw3ow



Published earlier than December 21, 2025 as demonstrated by this linkedin post: https://www.linkedin.com/posts/the-monster-library_were-finalists-remi-the-lighthouse-activity-7406749163436085248-5ktp





**LITTLE LIGHT** • Uplifting Song for Kids About Inner Strength and Positivity with the Fuzzlets

Shows similarity of Monster Library Character to Fuzzlets character design: (FUR TEXTURE and eyes)

✨ LITTLE LIGHT ✨ Uplifting Song for Kids About Inner Strength and Positivity with the Fuzzlets
https://www.youtube.com/watch?v=6xQhyNCgyc0

Published March 28, 2025

Time stamp: https://youtu.be/6xQhyNCgyc0?si=TdcFr8e9mIkkSU6Q&t=41

FuzzHermit & The Solitude Peak's Quest | Full Episode | Kids Cartoon Animation

Published May 31, 2025
https://www.youtube.com/watch?v=li7YcZqF65c

<mark>Character proportions and hat</mark>



**FuzzHermit & The Solitude Peak's Quest | Full Episode | Kids Cartoon Animation**

<mark>Time Stamp:</mark> https://youtu.be/li7YcZqF65c?si=3PsP8xbBZdt319HS&t=379



**FuzzHermit & The Solitude Peak's Quest | Full Episode | Kids Cartoon Animation**

PURP Character is shown with a beanie.

Time Stamp: https://youtu.be/li7YcZqF65c?si=uvekL5giZ-a5vK7D&t=175



**Remi & The Lighthouse: The Storm That Changed Everything**

The Monster Library

A typical fisherman beanie doesn't have a poof up top. This idea and look was copied from Fuzzlets.

The Fuzzlet hat design and look for PURP

🏡 OLD MCDONALD HAD A FARM 🏡 Sing Along with the Fuzzlets! 🎵
https://www.youtube.com/watch?v=6fqJ52AWg5E

Published Jan 22, 2025, PURP Character is shown with a beanie.

Time stamp: https://youtu.be/6fqJ52AWg5E?si=kXmMVUkl-w-gbvnh&t=56



🏡 OLD MCDONALD HAD A FARM 🏡 Sing Along with the Fuzzlets! 🎵

⭐ TWINKLE TWINKLE LITTLE STAR ⭐ Bedtime song | Sing Along with the Fuzzlets 🎵
https://www.youtube.com/watch?v=5HRrKZQxaXo

Published Jan 24, 2025, PURP Character is shown with a beanie.

Time Stamp: https://youtu.be/5HRrKZQxaXo?si=RB0KG3o9hPHuiVrl&t=70



⭐ **TWINKLE TWINKLE LITTLE STAR** ⭐ **Bedtime song | Sing Along with the Fuzzlets** 🎵